## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| BRANDON KENNEDY, | CIVIL ACTION NO. 5:21-cv-04247 |
|                Plaintiff, | JUDGE: |
|    v. | MAGISTRATE JUDGE: |
| OFFICER MONTRELL JACKSON, AND OFFICER JOHN DOE, INDIVIDUALLY; AND CITY OF SHREVEPORT POLICE CHIEF WAYNE SMITH, RECORDS CUSTODIAN FOR SHREVEPORT POLICE DEPARTMENT SERGEANT MICHAEL DUNN, AND RECORDS CUSTODIAN FOR SHREVEPORT POLICE DEPARTMENT JOHN DOE(S), IN THEIR OFFICIAL CAPACITIES. | *Jury Trial Demanded* |
|                Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Brandon Kennedy, Sr. ("Mr. Kennedy"), by and through his undersigned counsel, complains that Shreveport Police Department ("SPD") officers—Montrell Jackson and John Doe[1] ("Officer Defendants")—were acting under the color of law when they, together and separately, violated his constitutional and civil rights under federal and state laws by using excessive force against him on December 15, 2020.  Mr. Kennedy files this suit seeking justice for his ordeal on December 15, 2020 at the hands of Officer Defendants.  He also sues acting SPD Police Chief

---

[1]     Plaintiffs remain unable to name this Defendant due to the SPD's continued refusal to adequately respond to public records requests, in violation of LA. R.S. § 44:35, as detailed further herein.

Wayne Smith ("Defendant Smith")[2] for his failure to decertify officers who engage in egregious conduct such as that which Mr. Kennedy endured on December 15, 2020.  He further seeks to rectify the repeated failure of SPD Records Custodians Sergeant Michael Dunn and John Doe(s)[3] ("Recordkeeping Defendants," collectively with Officer Defendants and Defendant Smith, "Defendants") to respond to his public records requests.  In support of his claims, Mr. Kennedy hereby states and alleges as follows:

## NATURE OF THE ACTION

1.      On December 15, 2020, Officer Defendants used unnecessary and excessive force against Mr. Kennedy, a 37-year-old Black man, after Defendant Jackson overheard Mr. Kennedy speaking to a third party in a convenience store about the Black Lives Matter movement and his own negative experiences with the SPD.  Defendant Officers both provoked and escalated the situation, and in so doing severely injured Mr. Kennedy, who today continues to suffer from resulting physical pain in his neck and back, as well as emotional scarring.  This case confirms what research across the country and this state has shown: that police gratuitously use unnecessary, excessive, and violent force against unarmed non-resisting Black men.[4]

2.      Indeed, SPD currently has an overall Police Scorecard rating of 47%, which is comprised of poor scores for police accountability, police violence (including police killing of

---

[2]      SPD Police Chief Ben Raymond resigned earlier this year and named Assistant Chief Wayne Smith as the Interim Chief of Police, who is therefore named as the appropriate Defendant in his official capacity herein.

[3]      Given the circuitous nature of the responses received to public records requests submitted on Mr. Kennedy's behalf, as described herein, it is unclear who the appropriate records custodians are, let alone how many there are.  Mr. Kennedy intends to seek this information through discovery and amend as appropriate.

[4]      *See, e.g.*, Chris Nakamoto, Report says officers' actions were excessive force, borderline criminal, August 11, 2020, https://www.wbrz.com/news/investigative-unit-report-says-officers-actions-were-excessive-force-borderline-criminal/; Hoang Tran, Man alleges he was a victim of police brutality, February 23, 2016, https://louisianarecord.com/stories/510668193-man-alleges-he-was-a-victim-of-police-brutality

civilians), and arrests for low-level non-violent offenses.[5]  Based on data collected from 2013-2020, a Black person was 19x as likely to be killed by SPD than a White person.[6]  Further, despite being 56% of the population, Black people made up 81% of the people arrested by SPD and 62% of the people killed by SPD.[7]  This racial disparity in deadly force by SPD was worse than 36% of other departments.[8]  This consistent overrepresentation of Black death is deeply disturbing.

3.     Though the Officer Defendants' conduct towards Mr. Kennedy on December 15, 2020 may seem less extreme in comparison to some of the incidents of police brutality that dominate the airwaves, this case is no less a "knee on the neck of justice for Black Americans."[9] Mr. Kennedy was unarmed, fully cooperative at all times, and posed no threat or flight risk.  He did nothing wrong—indeed, Mr. Kennedy was never even accused of committing or charged with a crime in connection with this incident.  Nonetheless, and for no justifiable reason, Defendant Jackson used excessive and violent force to subdue and handcuff Mr. Kennedy.

4.     The unnecessary and abusive use of force in this case reinforces a history of distrust between the police and the communities they are charged to serve and protect.[10]

---

[5]     Police Scorecard, Shreveport Police Department (2020), https://policescorecard.org/la/police-department/shreveport (The Police Scorecard, built by Samuel Sinyangwe and a team of data scientists, designers, developers, organizers, and students, is a nationwide public evaluation of policing in the United States. The Scorecard calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies).

[6]     *Id.*

[7]     *Id.*

[8]     *Id.*

[9]     Transcript of President Joe Biden addressing the nation on April 20, 2021, available at https://www.nytimes.com/2021/04/20/us/politics/biden-harris-chauvin-verdict-transcript.html.

[10]    *See, e.g.*, Cassandra Chaney & Ray V. Robertson, Racism and Police Brutality in America, 17 J. Afr. Am. St. 480 (2013); Jocelyn R. Smith Lee, et al., *"That's My Number One Fear in Life. It's the Police*": *Examining Young Black Men's Exposures to Trauma and Loss Resulting From Police Violence and Police Killings*, 45 J. of Black Psychology 143 (2019); Marlese Durr, *What is the Difference between Slave Patrols and Modern Day Policing? Institutional Violence in a Community of Color*, 41 Critical Sociology 873 (2015); Rod K. Brunson, *"Police Don't Like Black People": African-American Young Men's Accumulated Police Experiences*, 6

5.      This conduct is repugnant to basic notions of human dignity, and violative of Mr. Kennedy's constitutional rights.  The banality of the police interaction here—gratuitous abuse during an interaction with a citizen exercising his constitutional right to free speech—only highlights the urgency of holding the Officer Defendants accountable.  There was no "tense, uncertain, and rapidly evolving situation" in which the Officer Defendants had to make a "split-second judgment" about how much force to use.[11]  Mr. Kennedy was buying groceries.  He committed no crime.  He simply exercised his First Amendment Right to make statements Defendant Jackson disagreed with.  If law enforcement cannot resist using excessive force against a Black man when circumstances are safe and easy, the situation is virtually certain to turn tragic when the call is more difficult.[12]

6.      On December 15, 2020, Mr. Kennedy was standing in the checkout line at a local store.  As he waited in the queue, he struck up a conversation with another customer.  During that conversation, he expressed his support for the Black Lives Matter movement and discussed his own negative experiences with SPD.

7.      As the conversation continued, Defendant Jackson—a uniformed SPD officer— appeared behind Mr. Kennedy.

---

Criminology & Public Policy 71 (2007).

[11]      *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[12]      *See, e.g.*, Andrew Boryga, *Black men beaten and shot. A lack of outside scrutiny. And residents running out of patience,* May 19, 2021, https://www.thedailybeast.com/shreveport-louisiana-cops-ran-wild-under-trump-will-biden-send-in-the-feds; Deborah Bayliss, *Eight Shreveport police officers indicted on excessive force incident*, June 30, 2020, https://www.shreveporttimes.com/story/news/2020/06/30/eight-shreveport-police-officers-indicted-excessive-force-incident/3283300001/.

8.     Mr. Kennedy, continuing his conversation with the other customer, said "I have to watch my back because the police like to put their hands on me."[13]

9.     Upon overhearing Mr. Kennedy's comments, Defendant Jackson interrupted the conversating, saying, "excuse me, what did you say?"

10.    Mr. Kennedy replied, "I said I have to watch y'all because y'all like to put your hands on me."

11.    Defendant Jackson then ordered Mr. Kennedy to "step outside with me." Defendant Jackson waited behind Mr. Kennedy as he completed his grocery purchase.

12.    Mr. Kennedy completed his purchase and immediately placed his hands behind his back, as a sign of compliance, and began walking out of the store.  Defendant Jackson followed behind him, making it clear Mr. Kennedy was not free to leave.

13.    After exiting the store, Defendant Jackson asked Mr. Kennedy if he "want[ed] to do something" and if he "want[ed] an altercation."  To this, Mr. Kennedy replied "no, I'm not stupid."

14.    Defendant Jackson then ordered, "well then, get your motherfucking ass up the street!"

15.    Mr. Kennedy followed the officer's orders and as he walked away said "man, you can't talk to me like that, I pose no threat to you."

16.    Mr. Kennedy, indeed, had committed no crime, posed no threat, and fully complied with Defendant Jackson's orders.

17.    But instead of allowing Mr. Kennedy to leave in peace, Defendant Jackson did what no police officer should do: He attacked an unarmed Black man offering his full cooperation.

---

[13]    Verbal quotes referenced throughout the Complaint are based on Mr. Kennedy's best recollection and may not capture exact wording.

18.     Defendant Jackson approached Mr. Kennedy, grabbed him by the neck, and slammed him to the ground. Defendant Jackson then forcibly placed his knee on Mr. Kennedy's back.  With Mr. Kennedy already fully subdued under Defendant Jackson's knee, Defendant Jackson continued his assault by grabbing Mr. Kennedy's face with both hands and forcibly slamming Mr. Kennedy's face into the concrete pavement.

19.     As he did so, another officer, Defendant Doe, approached from a nearby police cruiser.  To add insult to injury, rather than intervene to stop Defendant Jackson's brutality, Defendant Doe further exacerbated the unconstitutional harm being exacted on Mr. Kennedy. Condoning Defendant Kennedy's callous disregard for the constitutional rights of those SPD is sworn to serve and protect, Defendant Doe did nothing to stop the attack, and instead took Mr. Kennedy's groceries and said that Mr. Kennedy could "get them back once [he got] out of the hospital."

20.     Officer Defendants handcuffed Mr. Kennedy as he lay on the ground.

21.     Surveillance footage that captured the encounter shows Mr. Kennedy posed no threat to Defendant Officers, others, or himself.

22.     Defendant Jackson's and Defendant Doe's attack on Mr. Kennedy is another example of the racialized policing that has become common in this country.[14]

23.     To be clear, this brutal assault and unlawful arrest was precipitated because Mr. Kennedy expressed his personal viewpoint regarding the Black Lives Matter movement and his own negative experiences with the SPD to a third party in the checkout line of a store.

---

[14]     *See e.g.*, Emily Enfinger, Shreveport Times, *Shreveporter initiates legal action against city concerning false arrest, excessive force*, August 20, 2019, https://www.shreveporttimes.com/story/news/2019/08/20/shreveporter-sues-city-shreveport-concerning-false-arrest-excessive-force/2021615001/

24.     There was no legitimate or lawful reason to attack or detain Mr. Kennedy.  In an attempt to use the search incident to arrest doctrine as an opportunity to find evidence of a crime and justify Mr. Kennedy's unlawful arrest, Officer Defendants searched Mr. Kennedy's person and belongings, including a plastic bag of goods Mr. Kennedy had bought at the Family Dollar store.

25.     Left empty-handed by their unlawful search, Officer Defendants tried to find another way to further punish Mr. Kennedy for his constitutionally-protected speech.  Rather than let him go, they placed the now-injured Mr. Kennedy in the back of Defendant Jackson's police cruiser.  They told Mr. Kennedy, whose face had started to swell as a consequence of the attack, that they were driving him to the "psych ward."

26.     When Mr. Kennedy asked why Officer Defendants had arrested him, Defendant Jackson stated he was not arresting Mr. Kennedy or accusing him of any crime.  Instead, Defendant Jackson said he was taking Mr. Kennedy to the hospital for a mental evaluation.

27.     Defendant Jackson then drove Mr.  Kennedy to Ochsner LSU Health Shreveport, a public-private hospital (the "Hospital").  They arrived at the hospital at approximately 8:30 pm.

28.     At no point during this incident did Mr. Kennedy display any behavior warranting the Officer Defendant's physical assault on his person, let alone a trip to the "psych ward."

29.     At the Hospital, Defendant Jackson escorted Mr. Kennedy in handcuffs through the front desk of the hospital up to the hospital's psychiatric ward where Defendant Jackson and Mr. Kennedy waited for Mr. Kennedy to be seen by a psychiatrist.

30.      After about twenty minutes, Mr. Kennedy was seen by hospital staff who informed Defendant Jackson and Mr. Kennedy that the psychiatrist would not arrive until the following

morning, and so Mr. Kennedy would have to remain overnight in the psychiatric ward until he could be evaluated.

31.     Because Mr. Kennedy was brought to the hospital involuntarily by a police officer, Mr. Kennedy was told he could not leave the psychiatric ward until he was evaluated by a psychiatrist.  After learning that Mr. Kennedy would stay overnight, Defendant Jackson left Mr. Kennedy in the hospital.

32.     The following morning, December 16, 2020, at approximately 7 a.m., the hospital's psychiatrist evaluated Mr. Kennedy, and determined that there was no basis to hold him.

33.     After his evaluation, Mr. Kennedy remained at the hospital until approximately 10 a.m. when his father arrived to pick him up.

34.     Mr. Kennedy's injuries persisted.  Two days after the incident, Mr. Kennedy took himself to the emergency room at the Hospital.  There, Mr. Kennedy was diagnosed with neck and muscle strain and rib pain on his left side.  Mr. Kennedy also continues to suffer ongoing mental and emotional distress with PTSD-type symptoms, including sleeplessness, anxiety, paranoia, sadness, anger, and depression.  Mr. Kennedy now takes medication to alleviate the physical and emotional pain resulting from his ordeal.

35.     The unconstitutional attack on Mr. Kennedy is particularly notable, and especially shocking, because the Officer Defendants assaulted and detained Mr. Kennedy in order to silence and punish his constitutionally-protected speech about police misconduct.

36.     Without accountability, law enforcement will continue to violate the constitutional rights of Black people with impunity, producing disastrous consequences.  Mr. Kennedy survived the Officer Defendants' attack, but with lasting physical and emotional injury.  Many others do not live to seek justice for their mistreatment.

## JURISDICTION AND VENUE

37.     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution, and the laws of the State of Louisiana. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 1343(3) and the aforementioned statutory provisions.

38.     This Court, under 28 U.S.C. § 1367, has supplemental jurisdiction over claims that arise under the laws of the State of Louisiana because they are derived from the same common nucleus of operative fact as the federal claims.

39.     This Court has personal jurisdiction over the Defendants and venue is proper in the Western District of Louisiana under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this district and all Defendants reside in the forum state while at least one defendant resides in this district.

40.     At all relevant times, Defendants were acting under color of law within the meaning of 42 U.S.C. § 1983.

## PARTIES

41.     Plaintiff Brandon Kennedy, Sr., is a 37-year-old father, student, and a lifetime citizen of Louisiana.

### *Defendant Officers*

42.     Defendant Montrell Jackson ("Defendant Jackson") was, at all relevant times, an officer with SPD.  Defendant Jackson was at all relevant times employed by SPD as a police officer, acting in the course and scope of his employment, and enforcing the customs, policies and procedures of the City of Shreveport, SPD, and the ordinances and laws of the City of Shreveport

9

and State of Louisiana.  On information and belief, Defendant Jackson resides in Shreveport, Louisiana.  Defendant Jackson is sued in his individual capacity.

43.     Defendant John Doe ("Defendant Doe") was, at all relevant times, an officer at SPD.  Defendant Doe was at all relevant times employed by the SPD as a police officer, acting in the course and scope of his employment, and enforcing the customs, policies and procedures of the City of Shreveport, SPD, and the ordinances and laws of the City of Shreveport and State of Louisiana.  Plaintiff is unaware of the name and capacity of Defendant Doe (due to Recordkeeping Defendants' indifference towards public records requests and dilatory tactics) and therefore sues Defendant Doe by a fictitious name. On information and belief, Defendant Doe is a citizen within this Court's jurisdiction. Plaintiff will amend this Complaint to state the true name and capacity of Defendant Doe when such has been ascertained.  Defendant Doe is sued in his individual capacity.

44.     Officer Defendants are liable jointly, severally, and *in solido* for the intentional, excessive, and/or otherwise unconstitutional and tortious conduct set forth below.

### *Defendant Smith*

45.     Defendant Chief Wayne Smith ("Defendant Smith"), the decision-maker for the SPD, upon information and belief, is a citizen within this Court's jurisdiction. Defendant Smith is named in his official capacity and was at all pertinent times acting under the color of state law and the authority of the SPD.

### *Recordkeeping Defendants*

46.     SPD Records Custodian Sergeant Michael Dunn ("Defendant Dunn"), upon information and belief, is a citizen within this Court's jurisdiction. Defendant Dunn is named in his official capacity and was at all pertinent times acting under the color of state law and the authority of the SPD.

47.     SPD Records Custodian John Doe(s) ("Recordkeeping Defendant Doe(s)"), upon information and belief, is/are citizen(s) within this Court's jurisdiction. Recordkeeping Defendant Doe(s) is/are named in their official capacity and was/were at all pertinent times acting under the color of state law and the authority of the SPD.

## FACTUAL ALLEGATIONS

### *Mr. Kennedy's Exercise of Free Speech*

48.     On December 15, 2020, Mr. Kennedy was grieving the recent death of his grandmother who had raised him since birth.  With his grandmother's birthday coming up the next day, Mr. Kennedy needed to clear his mind.  Mr. Kennedy sought fresh air and went to the Family Dollar store to buy groceries for himself and his family.

49.     As he waited in the checkout line, Mr. Kennedy struck up a conversation with another customer.   During that conversation, he expressed his support for the Black Lives Matter movement and discussed his own negative experiences with SPD.

50.     As the conversation continued, Defendant Jackson—a uniformed SPD officer— appeared behind Mr. Kennedy.  Upon information and belief, Defendant Jackson was on-duty at the time.

51.     Mr. Kennedy, continuing his conversation with the other customer, said "I have to watch my back because the police like to put their hands on me."

52.     Defendant Jackson overheard Mr. Kennedy's conversation with the female customer and confronted Mr. Kennedy.

53.     Upon overhearing Mr. Kennedy's comments, Defendant Jackson interrupted the conversating, saying, "excuse me, what did you say?"

54.     Mr. Kennedy said, "I said I have to watch y'all because y'all like to put your hands on me."

55.     In response, Defendant Jackson ordered Mr. Kennedy to "step outside with me." Defendant Jackson waited behind Mr. Kennedy as he completed his grocery purchase.

***Defendant Police Officers Unlawfully Attack, Arrest, and Search Mr. Kennedy***

56.     Mr. Kennedy completed his purchase and immediately placed his hands behind his back as he left the Family Dollar.  Mr. Kennedy still held the bag of groceries he had just purchased.

57.     Mr. Kennedy's hands remained behind his back throughout his encounter with Defendant Jackson outside the Family Dollar.  Mr. Kennedy was unarmed and did not at any point threaten or resist Defendant Jackson.

58.     As they stood just outside the Family Dollar, beneath one of the store's security cameras aimed at the sidewalk and abutting parking lot, Defendant Jackson asked Mr. Kennedy if he "want[ed] to do something" or "want[ed] an altercation."  To this, Mr. Kennedy replied "no, I'm not stupid."

59.     Defendant Jackson then ordered, "well then, get your motherfucking ass up the street!"

60.     Mr. Kennedy followed the officer's orders and as he walked away said "man, you can't talk to me like that, I pose no threat to you."

61.     Even though Mr. Kennedy had not made any threatening moves nor otherwise acted aggressively, Defendant Jackson re-approached Mr. Kennedy, and grabbed him by the neck.

62.     Defendant Jackson then forcefully slammed Mr. Kennedy's face and body onto the concrete pavement.

63.     Defendant Jackson's assault on Mr. Kennedy was recorded by the Family Dollar's video surveillance.   The following are stills from that surveillance video reflecting Defendant Jackson's initial assault on Mr. Kennedy.

64.     Here, Defendant Jackson (circled in yellow) can be seen walking towards Mr. Kennedy (wearing a red sweater).  Mr. Kennedy can be seen with his hands behind his back, holding the groceries in a white bag:



65.    Next, we see Defendant Jackson (indicated with a yellow arrow) come up to Mr.

Kennedy:



66.    Defendant Jackson (indicated again with a yellow arrow) then grabbed Mr.

Kennedy, bending his knees in preparation to throw Mr. Kennedy to the ground:



67.     Defendant Jackson (indicated with a yellow arrow) tackles Mr. Kennedy to the ground:



68.     Defendant Jackson stands over Mr. Kennedy, who is now laying on the ground:



69.     As Mr. Kennedy lay face-down on the ground, Defendant Jackson forced his knee into Mr. Kennedy's neck and back.  Continuing his assault, Defendant Jackson then grabbed Mr. Kennedy's face with both hands and forcibly slammed his face onto the concrete pavement.

70.     As he did so, another officer, Defendant Doe, approached from a nearby police cruiser.  Condoning Defendant Kennedy's callous disregard for the constitutional rights of those the SPD is sworn to serve and protect, Defendant Doe did nothing to stop the attack.

71.     Officer Defendants handcuffed Mr. Kennedy as he lay on the ground.

72.     Surveillance footage that captured the encounter shows Mr. Kennedy posed no threat to Defendant Officers, others, or himself.

### Defendant Officers Transport Mr. Kennedy to the "Psych Ward"

73.     Once Mr. Kennedy was in handcuffs, Defendant Doe told him that he could "get [his groceries] back after [he] go[es] to the hospital."  Officer Defendants stated further that Mr. Kennedy was "going to the psych ward at the hospital."

74.     Mr. Kennedy complained about his treatment, and the pain he was in, but remained passive and did not fight or resist in any way.

75.     When Mr. Kennedy asked why he was being arrested, Defendant Jackson stated that he was not arresting Mr. Kennedy or accusing him of any crime.  Instead, Defendant Jackson said he was going to take Mr. Kennedy to the hospital for a mental evaluation.

76.     Mr. Kennedy was placed into Defendant Jackson's patrol car and driven to the Hospital. On the ride over, Mr. Kennedy complained to Defendant Jackson about his unfair, violent treatment.  Defendant Officers admitted that Mr. Kennedy had not committed a crime, but that they were taking him to the "psych ward" because, in their words, "you said you like to fight the police."

77.     At the Hospital, Defendant Jackson escorted Mr. Kennedy in handcuffs through the front desk of the hospital up to the hospital's psychiatric ward, where Defendant Jackson and Mr. Kennedy waited for Mr. Kennedy to be seen by a psychiatrist.  After about twenty minutes,

Mr. Kennedy was seen by a doctor who informed Defendant Jackson and Mr. Kennedy that Mr. Kennedy would have to remain overnight in the psychiatric ward until he could be seen by the hospital's head psychiatrist the following morning.

78.     Because Mr. Kennedy was brought to the hospital involuntarily by a police officer, Mr. Kennedy was told he could not leave the psychiatric ward until he was evaluated by a psychiatrist.  After learning that Mr. Kennedy would stay overnight, Defendant Jackson left him in the hospital.

79.     To be clear, Mr. Kennedy only stayed at the hospital overnight because he was brought there in police custody and the psychiatrist would not arrive until the following morning.

80.     The following morning, December 16, 2020, at approximately 7 a.m., the hospital's psychiatrist evaluated Mr. Kennedy, who determined that there was no basis to hold Mr. Kennedy.

81.     After his evaluation, Mr. Kennedy remained at the hospital until approximately 10 a.m., when his father arrived to pick him up.

82.     Mr. Kennedy was never charged with any crime related to this incident.

***Mr. Kennedy Suffers Lasting Physical and Emotional Pain as a Direct Result of His Encounter with Officer Defendants***

83.     In the days following the assault, Mr. Kennedy continued to experience extreme pain and additional swelling to his face, which had been injured when he was slammed to the ground.   Accordingly, on December 17, 2020, Mr. Kennedy took himself to the Hospital's emergency room ("ER").

84.     At the ER, Mr. Kennedy was diagnosed with neck and muscle strain and rib pain on his left side.  The ER administered Mr. Kennedy a non-steroidal anti-inflammatory drug, Ketorolac, to treat his swelling.  Mr. Kennedy was further prescribed Cyclobenzaprine (a muscle relaxant) and Ibuprofen (pain reliever and anti-inflammatory drug) to treat his pain and swelling.

85.     As a direct and proximate result of Defendant Officers' conduct as set forth above, Mr. Kennedy was substantially injured.  These injuries include, but are not limited to, loss of federal and state constitutional rights, physical injuries, great pain and emotional distress, and aggravation of pre-existing conditions.

86.     Mr. Kennedy also continues to suffer ongoing mental and emotional distress with PTSD-type symptoms, including sleeplessness, anxiety, paranoia, sadness, anger, depression, and frustration stemming from mistreatment by law enforcement.

87.     Mr. Kennedy now takes medication for pain resulting from his injuries and also to address his sleeplessness and other emotional distress.

***Recordkeeping Defendants Evade Mr. Kennedy's Requests for Information***

88.     Mr. Kennedy's legal counsel has submitted a series of public information requests to the SPD seeking information and documents regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant Doe on December 15, 2020.

89.     In response, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, unlawfully resisting the SPD's statutory obligation to respond to the public information requests, and when they did choose to respond, did so with incomplete or inadequate information.

90.     Mr. Kennedy's counsel submitted four formal and written public records requests to SPD: on March 25, 2021, April 12, 2021, June 29, 2021, and October 27, 2021 (collectively "Requests") seeking information related to the December 15, 2020 incident. *See* Requests attached as Exhibits A, B, C, and D, respectively.

91. The Recordkeeping Defendants did not respond to the March 25 Request. Rather, the Shreveport Fire Department did. *See*, March 30, 2021 Response from the Shreveport Fire Department, attached as Exhibit E.

92. Unsurprisingly, as the Shreveport Fire Department has no relevance whatsoever to the submitted Requests or the December 15, 2020 incident, the Shreveport Fire Department indicated that they had no responsive documents.

93. Given this absurd and obviously inadequate response, Mr. Kennedy's counsel sent a second Request to the SPD on April 12, 2021.

94. On April 26, 2021 – 32 days after the original Request was sent – the Recordkeeping Defendants provided (a) an Offense Report relating to the December 15 incident; (b) a Background Event Chronology relating to the December 15 incident; and (c) two CD-ROMs with limited body camera footage and audio from Defendant Jackson reflecting a portion of the December 15 incident.

95. This response was both inadequate and incomplete. In both the March 25 and April 12 Requests, Mr. Kennedy's counsel sought "an opportunity to inspect or obtain copies of public records including, but not limited to, body camera footage, audio, radio calls, notes, and written documents, relating to any complaints Mr. Kennedy submitted regarding the December 15, 2020 incident, as well as any efforts by the department to investigate the same." Both requests further stated that it was "our understanding that the Internal Affairs Department has obtained a video recording of [the December 15 Incident]."

96. The Recordkeeping Defendants' April 26 response did not include any information regarding complaints made by Mr. Kennedy, or any video obtained by the Internal Affairs Department.

97.     Given the incomplete response, Mr. Kennedy's counsel contacted various individuals within the SPD informally several times by phone and through email for further information.   After weeks of being directed by phone to various departments within SPD – including (incredibly) the homicide unit – on May 26, 2021, counsel was directed to speak with Defendant Dunn in the Research and Planning Office, who assured counsel that he would appropriately respond to the Requests.

98.     On June 2, 2021, Defendant Dunn informed counsel that SPD did, in fact, have additional video footage and other records relating to the December 15 incident that had not yet been provided in response to the Requests.  Defendant Dunn indicated that he had forwarded this additional information to the City Attorney for review and assured counsel that the requested material would be provided no later than the following Monday, June 7, 2021.

99.     June 7, 2021 came and went with no further response from the Recordkeeping Defendants.

100.     On June 9, June 11, and June 21, 2021, counsel left voicemails for Defendant Dunn inquiring about the additional records.

101.     Counsel spoke with Defendant Dunn again on June 21, 2021.  During this call, Defendant Dunn contacted attorney Joseph Woodley, who indicated that he sent an email communication to counsel on June 3, 2021.  Counsel, however, never received said email.  Mr. Woodley indicated that he would waive the processing fees associated with this request due to the extreme delay and further stated that he would send the material to counsel that same day, June 21, 2021.  He did not.

102.     Mr. Kennedy's counsel did not receive any further information until June 25, 2021. That day, counsel received a corrupted video file and another copy of the same Offense Report that had already been sent on April 26, 2021.  No further information was included.

103.     On June 29, 2021, counsel submitted a third public records request and emailed a courtesy copy of the same request to both Defendant Dunn and Attorney Woodley.  Counsel received no response.

104.     On July 12, 2021, counsel again began contacting Defendant Dunn and Joseph Woodley by phone and email seeking a viewable copy of the video file.  After multiple email exchanges and phone calls, Defendant Dunn finally responded on July 19, 2021.  Following this phone call, Defendant Dunn emailed a viewable copy of the video file.

105.     To be clear, this video had originally been requested on March 25, 2021.  It was not produced until July 19, 2021, and only after arduous follow-up by counsel.

106.     The video file provided on July 19, 2021 appears to be security footage from a local business and reflects a portion of the interaction between Defendant Jackson and Mr. Kennedy on December 15, 2020.

107.     However, in a now familiar pattern, the video file is incomplete.  It is 48 seconds long and reflects only a portion of the incident.  Moreover, the video sent to counsel is not an original file.  It is, bizarrely, an unidentified person's cell phone recording of a computer screen playing a portion of the relevant video.

108.     In a continued effort to obtain a complete and original copy of this critical video evidence, counsel submitted a fourth public records request on October 27, 2021.  This Request reiterated counsel's request for an "opportunity to inspect or obtain copies of public records including, but not limited to, body camera footage, audio, radio calls, notes, and written

documents, relating to any complaints Mr. Kennedy submitted regarding the December 15, 2020

incident, as well as any efforts by the department to investigate the same."  The October 27, 2021

Request specifically emphasized that counsel was seeking a full and complete copy of any video

or audio footage of the December 15th incident – including, but not limited to, all surveillance

footage in SPD's possession reflecting the December 15th incident.

109.    Counsel's October 27, 2021 Request also sought additional documentary evidence

relevant to Mr. Kennedy's claims.  Specifically, the October 27, 2021 Request sought:

1. Records that can identify every officer involved in the December 15 Incident, including, but not limited to, an officer named Montrell D. Jackson with a badge number of 1535.

2. Any internal reports relating to the December 15 Incident, including, but not limited to, any reports written by the officers involved in the December 15 Incident.

3. All body, backseat, and dash-camera footage relating to the December 15 Incident.

4. All internal reports relating to the usage of body, backseat, and dash-camera footage by officers.

5. Any records relating to any investigation of the December 15 Incident, including the results of the investigation and the identity of the officer(s) who conducted the investigation.

6. Any records that are open, open but suspended, suspended, or in any other status regarding any prior disciplinary proceedings instituted and/or complaints filed against the officers involved in the December 15 Incident.

7. Any performance reviews, including emails regarding job performance and probationary evaluations for the officers involved in the December 15 Incident.

8. Any records regarding any prior investigations of the officers involved in the December 15 Incident, even if the investigation was unrelated to the December 15 Incident.

9. Any records regarding any trainings that the officers involved in the December 15 Incident have ever been required to attend relating to arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

10. Any records regarding any mandatory training programs for officers of the Shreveport Police Department relating to arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

11. Any records regarding the number of complaints made against the SPD for excessive force and/or police brutality in the last two years.

12. Any records regarding the number of arrests made by the SPD in the last two years.

13. Any records regarding the number of arrests and/or citations issued by the SPD in the last two years for resisting an officer with force or violence.

14. Any records regarding the SPD's policies and/or procedures for investigating claims of excessive force and/or police brutality.

15. Any records regarding the SPD's policies and/or procedures for an officer's use of force against arrestees.

16. Any records regarding the SPD's internal investigations and findings regarding reports of officers' use of excessive force.

17. Any records regarding public records requests received by the SPD in the last two years relating to claims of excessive force and/or police brutality.

18. Any records regarding public records requests received by the SPD in the last two years relating to an officer's use of force against arrestees.

19. Any records regarding the SPD's responses to the public records requests described in Nos. 17 and 18 above, including but not limited to, the date and content of the SPD's response to the public records requests described in Nos. 17 and 18 above.

110. On November 11, 2021, Mr. Kennedy's counsel once again followed up by email providing the October 27, 2021 Requests to both Defendant Dunn and Attorney Woodley. On November 13, 2021, Mr. Woodley responded to counsel via email that he "received [counsel's] email of November 11, 2021 regarding a Public Records Request dated October 27, 2021." Mr. Woodley responded further that he had been "advised by SPD the request is being processed" and that "[a]s soon as [he] know[s] when a response will be prepared," that he would "let [counsel] know."

111.     To date, Mr. Kennedy's counsel has not received any further response to their fourth public records request.

112.     This is not an isolated incident.  In Mr. Kennedy's case alone, the Recordkeeping Defendants have failed to adequately respond to four separate public records requests.

113.     Others have faced similar stonewalling from the Recordkeeping Defendants in response to similar requests.[15]

114.     Upon information and belief, the Recordkeeping Defendants have repeatedly, over a period of years, failed to adequately respond to public records requests.  This pattern spans requests from multiple unrelated parties, seeking information regarding various incidents of police misconduct.[16]

115.     As reported in the Shreveport Times: "This [failure to respond to a public records request pertaining to police misconduct] is one example of many. Both the City Attorney's Office and Woodley have denied or delayed multiple public records requests, indicating that the requests are 'overly broad and burdensome,' do not exist in a digital format, would 'consume' an extensive amount of time to redact, that 'numerous' hours are necessary to fulfill the request but that the exact number 'cannot be calculated at this time,' and requesting a deposit of funds prior to looking into the request in order to guarantee payment of fees, including additional financial compensation to staff fulfilling the request."

---

[15]      *See, e.g.,* Regan Bashara:  Becoming conscious, Shreveport Times (https://www.shreveporttimes.com/story/opinion/columnists/2021/06/11/regan-bashara-becoming-conscious/7606801002/, last accessed November 12, 2021).

[16]      *Id.* (explaining that the SPD's delayed or inadequate responses with regard to Wavey Austin and Tommie McGlothen are some "of many," and that public records requests are routinely "denied or delayed" amounting to "a stonewall of requests…making public records financially inaccessible, constructing false arguments, and improperly citing reasons for denial of public records.").

116.     Based on these similar experiences by multiple unrelated individuals seeking access to public records from the SPD regarding various instances of police misconduct, it is clear that the Recordkeeping Defendants are deliberately indifferent to the public records requests they are responsible for processing.  By refusing to ensure that public records requests are adequately and promptly responded to, the Recordkeeping Defendants have created an environment where victims of police brutality are cut off from the very information necessary to support their claims, thereby encouraging and enabling future police misconduct, and hamstringing efforts to bring judicial action against the perpetrators.

## COUNT ONE
**Retaliation in violation of 42 U.S.C. § 1983, the First Amendment to the U.S. Constitution, and Article I, § 7 of the Louisiana Constitution**
**(Against Defendant Jackson and Defendant Doe)**

117.     Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

118.     The First Amendment of the U.S. Constitution protects the rights of citizens to engage in certain constitutionally protected activity.  Individual speech regarding matters of public policy, public safety, and police misconduct, are examples of such protected activity.

119.     The First Amendment prohibits "abridging the freedom of speech," as applied to the states under the Fourteenth Amendment to the United States Constitution.

120.     Article I, Section Seven of the Louisiana Constitution prohibits the curtailment or restriction of the freedoms of speech and press and guarantees every person the right to "speak, write, and publish his sentiments on every subject."  La. Const. art. I, § 7.

121.     On December 15, 2020, Mr. Kennedy had a constitutional right under the First Amendment to speak to others regarding the Black Lives Matter movement, the misconduct of

25

SPD and its police officers, and Mr. Kennedy's own mistreatment by police.  Thus, Mr. Kennedy was engaged in protected First Amendment activity when he spoke about those matters.

122.    On December 15, 2020, Defendant Jackson responded to Mr. Kennedy's protected speech by attacking Mr. Kennedy, detaining him without a legitimate reason, searching his body, and transporting him to the psychiatric ward of the hospital to further silence and punish Mr. Kennedy.  This violence was done in response to, and because of, Mr. Kennedy's protected speech.

123.    Defendant Jackson violated Mr. Kennedy's First Amendment rights.  Defendant Doe assisted Defendant Jackson in violating Mr. Kennedy's First Amendment rights.  Any reasonable law enforcement officer would have known that this conduct would violate Mr. Kennedy's constitutional rights.

124.    Officer Defendants had no probable cause for arresting or searching Mr. Kennedy.

125.    As a direct and proximate result of Defendant Jackson's and Defendant Doe's behavior, Mr. Kennedy suffered actual physical, mental and emotional harm.

126.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

### COUNT TWO
**Illegal Detention and False Arrest under the Fourth and Fourteenth Amendments to the U.S. Constitution in violation of 42 U.S.C. § 1983
(Against Defendant Jackson and Defendant Doe)**

127.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

128.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable search and seizure by law enforcement officers.

129.    The Fourteenth Amendment of the U.S. Constitution protects citizens against arbitrary deprivation of life, liberty, or property by the state.

26

130.    The Fourth and Fourteenth Amendments prohibit arrest without probable cause.

131.    Defendants Jackson and Doe arrested Mr. Kennedy when they handcuffed him and placed him in their police cruiser.  Mr. Kennedy's arrest was unlawful because Defendants Jackson and Doe arrested him without probable cause.  The lack of probable cause to arrest Mr. Kennedy would have been evident to any reasonable person based on the facts and circumstances within Officer Defendants' knowledge at the time.  Officer Defendants did not witness Mr. Kennedy break any law, nor did they have any reason to believe that he had broken any law.

132.    By arresting Mr. Kennedy without probable cause, Officer Defendants violated Mr. Kennedy's Fourth and Fourteenth Amendment rights.

133.    Any reasonable officer would have known that arresting Mr. Kennedy under these circumstances would violate his constitutional rights.

134.    As a direct and proximate result of this false arrest, Mr. Kennedy suffered actual physical, mental, and emotional harm.

135.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

## COUNT THREE
### Improper search and seizure under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983
### (Against Defendant Jackson and Defendant Doe)

136.     Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

137.    The Fourth Amendment of the U.S. Constitution protects citizens against unlawful search and seizure by law enforcement officers.

138.    The Fourth Amendment prohibits law enforcement officers seizing a citizen without legal justification.

27

139.     Officer Defendants' search of Mr. Kennedy's person and belongings was unlawful. Officer Defendants searched Mr. Kennedy without probable cause.   By doing so, Officer Defendants violated Mr. Kennedy's Fourth Amendment rights.

140.     Any reasonable officer would have known that searching Mr. Kennedy under these circumstances would violate his constitutional rights.

141.     As a direct and proximate result of Officer Defendants' unlawful search, Mr. Kennedy suffered actual physical, mental, and emotional harm.

142.     Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

**COUNT FOUR**
**Excessive and unreasonable force under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983 (Against Defendant Jackson and Defendant Doe)**

143.      Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

144.     The Fourth Amendment of the U.S. Constitution guarantees a clearly established right to be free from excessive force at the hands of the police.

145.     Officer Defendants deprived Mr. Kennedy of clearly established rights guaranteed to him under the United States Constitution.

146.     Officer Defendants' use of excessive force against Mr. Kennedy was the direct and proximate cause of Mr. Kennedy's injuries.

147.     This use of force was not reasonable, proportional, or appropriate, given that Mr. Kennedy was unarmed, not resisting arrest, had his hands placed behind his back, had never made any threatening gestures toward Officer Defendants, and did not pose any threat to the safety of Officer Defendants or any other person.

148.    Any reasonable officer in these circumstances would have recognized that the excessive and violent force applied to Mr. Kennedy while he was compliant and otherwise subdued was utterly unjustified, unnecessary, excessive, and unreasonable.

149.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

**COUNT FIVE**
**Intentional, or Alternatively Negligent, Infliction of Emotional Distress**
**(Against Defendant Jackson and Defendant Doe)**

150.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

151.    In *White v. Monsanto Co.,* 585 So. 2d 1205 (La. 1991), the tort of intentional infliction of emotional distress was adopted as a viable cause of action.

152.    One who by extreme and outrageous conduct intentionally causes severe emotional distress to another, is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Id.*

153.    The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.*

154.    In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Id.*

155.    Officer Defendants' use of excessive force against Mr. Kennedy was the direct and proximate cause of Mr. Kennedy's injuries, which included and continue to include severe emotional distress.

156.    Mr. Kennedy was unarmed, not resisting arrest, had his hands placed behind his back, had never made any threatening gestures toward Officer Defendants, and did not pose any threat to the safety of Officer Defendants or any other person.

157.    Given these circumstances, Officer Defendants' use of force on Mr. Kennedy was extreme and outrageous.

158.    Upon information and belief, and based upon the disproportionate violent actions of Officer Defendants here in response to constitutionally protected speech, it is alleged that Officer Defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct

159.    Any reasonable officer in these circumstances would have recognized that the excessive and violent force applied to Mr. Kennedy while he was compliant and otherwise subdued was utterly unjustified, unnecessary, excessive, and unreasonable. Alternatively, the manner in which Defendants behaved was negligent.

160.    Mr. Kennedy is entitled to attorneys' fees and costs, prejudgment interest and any other relief allowable by federal law.

### COUNT SIX
### 42 U.S.C. § 1983 – *Monell* Claim (SPD Records Custodian Sgt. Michael Dunn, and SPD Records Custodian John Doe(s), in their official capacities)

161.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

162.    Mr. Kennedy brings this claim against the Recordkeeping Defendants for their deliberate indifference in responding to public records requests through their endorsement of dilatory tactics meant to delay or deny valid requests for critical information necessary for those seeking to rectify the harms caused by instances of police brutality.

163.    The Recordkeeping Defendants are responsible for the SPD's responses to valid public records requests regarding police misconduct.

164.    Mr. Kennedy's legal counsel has submitted four formal public records requests seeking information in the SPD's possession regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant Doe on December 15, 2020.

165.    In response and without justification, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, repeatedly and unlawfully resisted its statutory obligation to respond to the public information requests, and repeatedly responded with incomplete or inadequate information.  For example, the Recordkeeping Defendants provided incomplete body-camera footage and audio from Defendant Jackson reflecting only a portion of the December 15 incident, and failed to provide information regarding the SPD's decertification policies.

166.    The Recordkeeping Defendants' resistance to these requests submitted on Mr. Kennedy's behalf reflects deliberate indifference to their obligation to comply with Louisiana law in responding to these public records requests.

167.    Due to the deliberate indifference of the Recordkeeping Defendants, Mr. Kennedy has been unable to collect vital information about not only the facts and circumstances of his own attack by Officer Defendants, but other information related to the general policies and practices of the SPD.  This includes any records regarding the SPD's monitoring and enforcement of body-

camera usage among its officers and any records related to the SPD's decertification of officers due to previous offenses.   In fact, in Mr. Kennedy's case alone the SPD has violated its statutory obligation pursuant to LA. R.S. § 44:35 by failing to timely and adequately respond to public records requests of four separate occasions.

168.    Mr. Kennedy's experience is not unique, however.   Various others have faced similar tactics.[17]

169.    The Recordkeeping Defendants' deliberate indifference to the public records requests submitted to the SPD creates an environment where victims of police brutality are cut off from the very information necessary to support their claims, thereby encouraging and enabling future misconduct.

170.    As the direct and proximate result of Recordkeeping Defendants' deliberate indifference related to responding to public records requests, Mr. Kennedy suffered actual physical and emotional injuries, and other damages and losses as described herein.

171.    Mr. Kennedy seeks a declaration affirming that the Recordkeeping Defendants will abide by their statutory duties under LA. R.S. § 44:35 and adequately process public records requests submitted regarding police conduct in a timely manner as dictated by LA. R.S. § 44:35. Mr. Kennedy is additionally entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

---

[17]       *See, e.g.,* Regan Bashara:  Becoming conscious, *supra* fn. 15. (reporting delayed or inadequate responses to public records requests pertaining to the deaths of Wavey Austin and Tommie McGlothen in or shortly following SPD custody, explaining that these delayed or inadequate responses are some "of many," and that public records requests are routinely "denied or delayed" amounting to "a stonewall of requests…making public records financially inaccessible, constructing false arguments, and improperly citing reasons for denial of public records.").

## COUNT SEVEN
## 42 U.S.C. § 1983 – *Monell* Claim (SPD Chief Wayne Smith, in his official capacity)

172.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

173.    Mr. Kennedy brings this claim against Defendant Smith for his failure to maintain a policy of decertification whereby the SPD revokes the certificate or license of a police officer who commits certain offenses.

174.    Upon information and belief, the SPD does not revoke the certificates or license of police officers who commits certain offenses, including but not limited to, retaliating against individuals lawfully exercising their First Amendment Right to free speech, illegally detaining or falsely arresting individuals, and/or engaging in the use of excessive force.

175.    The SPD Chief of Police is responsible for the decertification of officers who have committed certain offenses.

176.    The lack of appropriate repercussions for police misconduct, like decertification, enables – and in fact encourages – such behavior to continue.

177.    Take for example the Officer Defendants' behavior towards Mr. Kennedy on December 15, 2020, as well as the SPD's abysmal overall Police Scorecard rating of 47%.[18]

178.    And yet, even given these facts, the SPD does not revoke the certificates or license of police officers who commit these types of serious offenses.

179.    Defendant Smith is deliberately indifferent to these consequences of his failure to decertify SPD officers who commit serious offenses in the line of duty, which allows these

---

[18]    Police Scorecard, Shreveport Police Department (2020), *supra* fn. 5.

atrocities to continue, including the Officer Defendant's assault and illegal detention of Mr. Kennedy on December 15, 2020.

180.    As the direct and proximate result of Defendant Smith's deliberate indifference related to the consequences of the SPD's refusal to decertify officers who commit serious offenses, Mr. Kennedy suffered actual physical and emotional injuries, and other damages and losses as described herein.

181.    Mr. Kennedy seeks a declaration affirming that the Defendant Smith will enact and enforce a policy of decertification whereby the SPD revokes the certificate or license of a police officer who commits certain offenses, including but not limited to, retaliating against individuals lawfully exercising their First Amendment Right to free speech, illegally detaining or falsely arresting individuals, and/or engaging in the use of excessive force.   Mr. Kennedy is additionally entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

## COUNT EIGHT
**Failure to respond to public records request under LA. R.S. § 44:35 (Against SPD Records Custodian Sgt. Michael Dunn, and SPD Records Custodian John Doe(s), in their official capacities)**

182.     Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

183.    The Public Records Act of Louisiana, La. Rev. Stat. Ann. § 44:31 et seq. allows any person of the age of majority the right to request and inspect any public record.

184.    Section 44:31 dictates that SPD has a responsibility and duty to provide access to public records.

185.    Section 44:32(D) of the Louisiana Public Records Act requires a response to public records requests within three business days.

186.     The SPD is a "public body" as defined by La. Rev. Stat. Ann. § 44:1(A)(1).

187.     No exception to the requirements outlined in La. Rev. Stat. Ann. § 44:31 et seq. exist here.

188.     Mr. Kennedy's legal counsel has submitted four formal public records requests seeking information in the SPD's possession regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant Doe on December 15, 2020.

189.     In response and without any explanation, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, repeatedly and unlawfully resisting their statutory obligation to respond to the public information requests, and repeatedly responded with incomplete or inadequate information.

190.     As a direct and proximate result of the Recordkeeping Defendants' inadequate and delayed responses to counsel's repeated public records requests, Mr. Kennedy has been deprived of his statutory right to "inspect, copy, or reproduce" the requested information.  La. Rev. Stat. Ann. § 44:31(B)(1).

191.     Mr. Kennedy is entitled to attorneys' fees and costs under La. R.S. 44:35.

**PRAYER FOR RELIEF**

Wherefore, in light of the foregoing, Mr. Kennedy respectfully requests that this Court enter judgment against each Defendant, jointly and severally, and award the following relief in the amount to be determined at trial for the violations of Mr. Kennedy's constitutional, statutory, and common-law rights:

a) Compensatory damages;
b) Punitive damages;
c) Special damages;
d) Reasonable attorneys' fees and costs;
e) Such other relief as this Court may deem just and proper.

Dated: December 10, 2021

Respectfully submitted,

By:

Megan E. Snider (SBN LA 33382)
msnider@laaclu.org
Nora S. Ahmed (SBN NY 5092374)
(*pro hac vice forthcoming*)
nahmed@laaclu.org
justicelab@laaclu.org
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
(t) 504 522 0628

Jeremy Blumenfeld (*pro hac vice forthcoming*)
Jared Killeen (*pro hac vice forthcoming*)
Christen Casale (*pro hac vice forthcoming*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 1.215.963.5000
Facsimile: 1.215.963.5001
jeremy.blumenfeld@morganlewis.com
jared.killeen@morganlewis.com
christen.casale@morganlewis.com

Latiera J. Scott-Johnson (*pro hac vice forthcoming*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 2800
Chicago, IL  60606-1511
Telephone: 1.312.324.1000
Facsimile: 1.312.324.1001
latiera.rayford@morganlewis.com

*Counsel for Plaintiff*