**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| BRANDON KENNEDY,<br><br>                    Plaintiff,<br><br>      v.<br><br>OFFICER MONTRELL JACKSON, AND OFFICER JUSTIN WHITE, INDIVIDUALLY; AND CITY OF SHREVEPORT POLICE CHIEF WAYNE SMITH, RECORDS CUSTODIAN FOR SHREVEPORT POLICE DEPARTMENT SERGEANT MICHAEL DUNN, AND RECORDS CUSTODIAN FOR SHREVEPORT POLICE DEPARTMENT JOHN DOE(S), INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES.<br><br>                    Defendants. | CIVIL ACTION NO. 5:21-cv-04247<br><br>JUDGE: Elizabeth E. Foote<br><br>MAGISTRATE JUDGE: Mark L. Hornsby<br><br>***Jury Trial Demanded*** |

## FIRST AMENDED COMPLAINT

1.      On December 15, 2020, Plaintiff Brandon Kennedy ("Plaintiff" or "Mr. Kennedy"), a 37-year-old Black man, was attacked, handcuffed, and detained against his will, by two Shreveport Police Department ("SPD") officers in retaliation for his constitutionally protected speech against police brutality and in support of the Black Lives Matter movement.  Mr. Kennedy, by and through his undersigned counsel, complains that SPD officers—Officer Montrell Jackson and Sergeant Justin White[1] ("Officer Defendants")—were acting under the color of law when they,

---

[1]      Until recently, Mr. Kennedy had been unable to ascertain Sergeant White's name.  Before filing his original complaint on December 10, 2021 (Dkt. 1), Mr. Kennedy submitted multiple public records requests seeking, among other things, the identity of the second SPD officer who assailed him on the night of December 15, 2020.  Receiving no adequate response, Mr. Kennedy filed his original complaint without knowing Sergeant White's name, whom the complaint identified as "Officer Doe."  Counsel for Defendants finally identified Sergeant White on April 19, 2022,

together and separately, violated his constitutional and civil rights under federal and state laws. The unconstitutional attack on Mr. Kennedy is particularly notable, and especially shocking, because the Officer Defendants assaulted and detained Mr. Kennedy in order to silence and punish his constitutionally protected speech about police misconduct.  Mr. Kennedy files this suit seeking justice for his ordeal at the hands of the Officer Defendants.

2.      Mr. Kennedy also sues acting SPD Police Chief Wayne Smith ("Defendant Smith")[2] for his ongoing failure to discipline or terminate officers who engage in severe misconduct such as the Officer Defendants' attack against him.  Defendant Smith's policy of turning a blind eye to officers' severe misconduct has created a culture that encourages—rather than punishes—police violence against Black civilians like Mr. Kennedy, a fact illustrated by the SPD's abysmal policing record and public data highlighting the SPD's disproportionate use of violence against Black people.  Defendant Smith's policy of permitting SPD officers' excessive violence to go unchecked means that offending officers are not decertified and removed from the police force, and therefore continue to mistreat unarmed civilians like Mr. Kennedy and many others.  Defendant Smith's policy was the moving force behind Mr. Kennedy's unlawful attack and arrest on December 15, 2020.

3.      Finally, Mr. Kennedy alleges that SPD Records Custodians Sergeant Michael Dunn and John Doe(s)[3] ("Recordkeeping Defendants," collectively with Officer Defendants and

---

over four months after Mr. Kennedy filed his original complaint and two months after he served his first set of discovery                    requests                    on                    Defendants.                    .

[2]      SPD Police Chief Ben Raymond resigned earlier this year and named Assistant Chief Wayne Smith as the Interim Chief of Police, who is therefore named as the appropriate defendant in his official capacity herein.

[3]      Given the circuitous nature of the responses received to public records requests submitted on Mr. Kennedy's behalf, as described herein, it is unclear who the appropriate records custodians are, let alone how many there are. Mr. Kennedy intends to seek this information through discovery and amend as appropriate.

Defendant Smith, "Defendants") violated the First and Fourteenth Amendments—which prohibit viewpoint discrimination and guarantee citizens a right to access information—by failing to respond to Mr. Kennedy's lawful public record requests because they sought information related to police misconduct.  The Recordkeeping Defendants' dilatory tactics and failure to adequately respond to Mr. Kennedy's requests also violated the Louisiana Public Records Act, La. Rev. Stat. Ann. § 44:31 et seq.

4.      In support of his claims, Mr. Kennedy hereby states and alleges as follows:

## NATURE OF THE ACTION

5.      On December 15, 2020, the Mr. Kennedy was standing in the checkout line at a local store.  As he waited in the queue, he struck up a conversation with another customer.   During that conversation, he expressed his support for the Black Lives Matter movement and discussed his own negative experiences with SPD.

6.      As the conversation continued, Defendant Jackson—a uniformed SPD officer—appeared behind Mr. Kennedy.  Mr. Kennedy, continuing his conversation with the other customer, said "I have to watch my back because the police like to put their hands on me."[4]  After a brief exchange, Defendant Jackson ordered Mr. Kennedy to leave the store.

7.      Outside, Defendant Jackson provoked and escalated the situation.   Defendant Jackson approached Mr. Kennedy, grabbed him by the neck, and slammed him to the ground. Defendant Jackson then forcibly placed his knee on Mr. Kennedy's back.  With Mr. Kennedy already fully subdued under Defendant Jackson's knee, Defendant Jackson continued his assault by grabbing Mr. Kennedy's face with both hands and forcibly slamming Mr. Kennedy's face into the concrete pavement.

---

[4]      Verbal quotes referenced throughout the Complaint are based on Mr. Kennedy's best recollection and may not capture exact wording.

8.     As Defendant Jackson was forcing Mr. Kennedy to the ground, Defendant White approached from a nearby police cruiser.  To add insult to injury, rather than intervene to stop Defendant Jackson's brutality, Defendant White did nothing to stop the attack, and instead took Mr. Kennedy's groceries.

9.     The Officer Defendants handcuffed Mr. Kennedy as he lay on the ground.

10.     Surveillance footage that captured the encounter shows Mr. Kennedy posed no threat to the Defendant Officers, others, or himself.   There was no legitimate or lawful reason to attack or detain Mr. Kennedy.  To be clear, this brutal assault and unlawful arrest were precipitated because Mr. Kennedy expressed his personal viewpoint regarding the Black Lives Matter movement and his own negative experiences with the SPD to a third party in the checkout line of a store.

11.     In an attempt to use the search-incident-to-arrest doctrine as an opportunity to find evidence of a crime and justify Mr. Kennedy's unlawful arrest, the Officer Defendants searched Mr. Kennedy's person and belongings, including a plastic bag of goods Mr. Kennedy had bought at the convenience store.

12.     Left empty-handed by their unlawful search, the Officer Defendants tried to find another way to further punish Mr. Kennedy for his constitutionally protected speech.  Rather than let him go, they placed the now-injured Mr. Kennedy in the back of Defendant Jackson's police cruiser.  When Mr. Kennedy asked why the Officer Defendants had arrested him, Defendant Jackson stated he was not arresting Mr. Kennedy or accusing him of any crime.  Instead, Defendant Jackson said he was taking Mr. Kennedy to the hospital for a mental evaluation.

13.     Defendant Jackson then drove Mr. Kennedy to Ochsner LSU Health Shreveport, a public-private hospital (the "Hospital").   At the Hospital, Defendant Jackson escorted

4

Mr. Kennedy in handcuffs to the hospital's psychiatric ward.  Because Mr. Kennedy was brought to the hospital involuntarily by a police officer, Mr. Kennedy was told he could not leave the psychiatric ward until he was evaluated by a psychiatrist.  The following morning, December 16, 2020, the hospital's psychiatrist evaluated Mr. Kennedy, and determined that there was no basis to hold him.

14.     Two days after the incident, Mr. Kennedy took himself to the emergency room at the Hospital.  There, Mr. Kennedy was diagnosed with neck and muscle strain and rib pain on his left side.  Mr. Kennedy also continues to suffer ongoing mental and emotional distress with PTSD-type symptoms, including sleeplessness, anxiety, paranoia, sadness, anger, and depression.  Mr. Kennedy now takes medication to alleviate the physical and emotional pain resulting from his ordeal.

15.     The Officer Defendants' conduct is repugnant to basic notions of human dignity, and violative of Mr. Kennedy's constitutional rights.  The banality of the police interaction here—gratuitous abuse during an interaction with a citizen exercising his constitutional right to free speech—only highlights the urgency of holding the Officer Defendants accountable.  There was no "tense, uncertain, and rapidly evolving situation" in which the Officer Defendants had to make a "split-second judgment" about how much force to use.[5]  Mr. Kennedy was buying groceries.  He committed no crime.  He simply exercised his First Amendment right to make statements Defendant Jackson disagreed with.  If law enforcement cannot resist using excessive force against a Black man when circumstances are safe and easy, the situation is virtually certain to turn tragic when the call is more difficult.[6]

---

[5]     *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[6]     *See, e.g.*, Andrew Boryga, *Black men beaten and shot. A lack of outside scrutiny. And residents running out of patience,* May 19, 2021, https://www.thedailybeast.com/shreveport-louisiana-cops-ran-wild-under-trump-will-

16.     Though the Officer Defendants' conduct towards Mr. Kennedy on December 15, 2020, may seem less extreme in comparison to some of the incidents of police brutality that dominate the airwaves, this case is no less a "knee on the neck of justice for Black Americans."[7] Defendant Jackson's and Defendant White's attack on Mr. Kennedy is another example of the racialized policing that has become common in this country.[8]

17.     The unnecessary and abusive use of force in this case reinforces a history of distrust between the police and the communities they are charged to serve and protect.[9]   Moreover, this case confirms what research across the country and this state has shown: that police gratuitously use unnecessary, excessive, and violent force against unarmed non-resisting Black men.[10]

18.     It also confirms that the SPD—and, in particular, Defendant Smith—has repeatedly failed to discipline or terminate officers who commit serious offenses against those they are sworn to protect.  Defendant Smith's sustained pattern of tolerating police officers who engage in serious

---

biden-send-in-the-feds; Deborah Bayliss, *Eight Shreveport police officers indicted on excessive force incident*, June 30, 2020, https://www.shreveporttimes.com/story/news/2020/06/30/eight-shreveport-police-officers-indicted-excessive-force-incident/3283300001/.

[7]     Transcript of President Joe Biden addressing the nation on April 20, 2021, available at https://www.nytimes.com/2021/04/20/us/politics/biden-harris-chauvin-verdict-transcript.html.

[8]     *See e.g.*, Emily Enfinger, Shreveport Times, *Shreveporter initiates legal action against city concerning false arrest, excessive force*, August 20, 2019, https://www.shreveporttimes.com/story/news/2019/08/20/shreveporter-sues-city-shreveport-concerning-false-arrest-excessive-force/2021615001/

[9]     *See, e.g.*, Cassandra Chaney & Ray V. Robertson, Racism and Police Brutality in America, 17 J. Afr. Am. St. 480 (2013); Jocelyn R. Smith Lee, et al., "*That's My Number One Fear in Life. It's the Police*": *Examining Young Black Men's Exposures to Trauma and Loss Resulting From Police Violence and Police Killings*, 45 J. of Black Psychology 143 (2019); Marlese Durr, *What is the Difference between Slave Patrols and Modern Day Policing? Institutional Violence in a Community of Color*, 41 Critical Sociology 873 (2015); Rod K. Brunson, "*Police Don't Like Black People*": *African-American Young Men's Accumulated Police Experiences*, 6 Criminology & Public Policy 71                                                                                                                                                 (2007).

[10]     *See, e.g.*, Chris Nakamoto, Report says officers' actions were excessive force, borderline criminal, August 11, 2020, https://www.wbrz.com/news/investigative-unit-report-says-officers-actions-were-excessive-force-borderline-criminal/; Hoang Tran, Man alleges he was a victim of police brutality, February 23, 2016, https://louisianarecord.com/stories/510668193-man-alleges-he-was-a-victim-of-police-brutality

misconduct constitutes a de-facto policy and ensures that his officers' poor conduct will continue. Defendant Jackson and Defendant White felt comfortable assaulting Mr. Kennedy because they knew they would not be punished under Defendant Smith's policy.  The Officer Defendants' brutal attack and illegal detention of Mr. Kennedy is just one illustration of Defendant Smith's policy in action.

19.     Indeed, data collected by The Police Scorecard—a group of researchers who calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies—shows that the SPD received a shockingly low rating in various categories. For example, the SPD has received poor scores for police accountability, police violence (including police killing of civilians), and arrests for low-level non-violent offenses.[11]  The SPD ranked worse than nearly 70% of its peers when it comes to using deadly force against unarmed civilians.  One of the starkest takeaways from the Police Scorecard report is that a Black person was 19 times more likely to be killed by the SPD than a White person between 2013 and 2020.[12]  Despite being 56% of the population, Black people made up 81% of the people arrested by SPD and 62% of the people killed by SPD.[13]  This racial disparity in deadly force by the SPD was worse than 36% of other departments.[14]  This consistent overrepresentation of Black death is deeply disturbing, and vividly illustrates the consequences of

---

[11]     Police Scorecard, Shreveport Police Department (2020), https://policescorecard.org/la/police-department/shreveport (The Police Scorecard, built by Samuel Sinyangwe and a team of data scientists, designers, developers, organizers, and students, is a nationwide public evaluation of policing in the United States. The Scorecard calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies).

[12]     *Id.*

[13]     *Id.*

[14]     *Id.*

Defendant Smith's failure to maintain a policy of decertification.

20.     Since December 15, 2020, the SPD has further violated Mr. Kennedy's constitutional rights.  The First Amendment of the U.S. Constitution protects the right of citizens to gather news from any source by means within the law.  The First Amendment also prohibits the government from limiting the stock of information from which members of the public may draw. The Fourteenth Amendment of the U.S. Constitution prohibits disparate treatment of citizens under the law.  Sergeant Dunn and the other Recordkeeping Defendants are responsible for the SPD's responses to public-records requests from citizens regarding information maintained by the SPD. This includes information regarding police misconduct.  Yet Sergeant Dunn and the other Recordkeeping Defendants have employed various dilatory tactics to prevent Mr. Kennedy from gathering records concerning his attack by the Officer Defendants on December 15, 2020, and the SPD's mistreatment of other unarmed Black civilians. The Recordkeeping Defendants' tactics of providing inadequate responses—or, oftentimes, no response at all—to Mr. Kennedy's valid public-records requests amounts to view-point discrimination under the First and Fourteenth Amendments.   The Recordkeeping Defendants have treated Mr. Kennedy's requests for information regarding SPD misconduct differently than they treat other requests for records that do not pertain to police misconduct.  In so doing, they have prevented Mr. Kennedy from collecting information vital to his claims here on the basis that the SPD and the Recordkeeping Defendants disapprove of Mr. Kennedy's viewpoint that he was the victim of police violence.  As a result, the Recordkeeping Defendants have stifled Mr. Kennedy's ability to pursue his claims within this Court.

21.     Without accountability, law enforcement will continue to violate the constitutional rights of Black people with impunity, producing disastrous consequences.  Mr. Kennedy survived

the Officer Defendants' attack, but with lasting physical and emotional injury.  Many others do not live to seek justice for their mistreatment.

**JURISDICTION AND VENUE**

22.     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws of the State of Louisiana. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 1343(3) and the aforementioned statutory provisions.

23.     This Court, under 28 U.S.C. § 1367, has supplemental jurisdiction over claims that arise under the laws of the State of Louisiana because they are derived from the same common nucleus of operative fact as the federal claims.

24.     This Court has personal jurisdiction over the Defendants and venue is proper in the Western District of Louisiana under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this district and all Defendants reside in the forum state while at least one defendant resides in this district.

25.     At all relevant times, Defendants were acting under color of law within the meaning of 42 U.S.C. § 1983.

**PARTIES**

26.     Plaintiff Brandon Kennedy, Sr., is a 37-year-old father, student, and a lifetime citizen of Louisiana.

***Defendant Officers***

27.     Defendant Montrell Jackson ("Defendant Jackson") was, at all relevant times, an officer with SPD.  Defendant Jackson was at all relevant times employed by SPD as a police officer, acting in the course and scope of his employment, and enforcing the customs, policies and

procedures of the City of Shreveport, SPD, and the ordinances and laws of the City of Shreveport and State of Louisiana.  On information and belief, Defendant Jackson resides in Shreveport, Louisiana.  Defendant Jackson is sued in his individual capacity.

28.     Defendant Justin White ("Defendant White") was, at all relevant times, an officer at SPD.  Defendant White was at all relevant times employed by the SPD as a police officer, acting in the course and scope of his employment, and enforcing the customs, policies and procedures of the City of Shreveport, SPD, and the ordinances and laws of the City of Shreveport and State of Louisiana.   On information and belief, Defendant White resides in Shreveport, Louisiana. Defendant White is sued in his individual capacity.

29.     Officer Defendants are liable jointly, severally, and *in solido* for the intentional, excessive, and/or otherwise unconstitutional and tortious conduct set forth below.

### Defendant Smith

30.     Defendant Chief Wayne Smith ("Defendant Smith"), the decision-maker for the SPD, upon information and belief, is a citizen within this Court's jurisdiction. Defendant Smith is named in his official and individual capacities and was at all pertinent times acting under the color of state law and the authority of the SPD.

### Recordkeeping Defendants

31.     SPD Records Custodian Sergeant Michael Dunn ("Defendant Dunn"), upon information and belief, is a citizen within this Court's jurisdiction. Defendant Dunn is named in his official and individual capacities and was at all pertinent times acting under the color of state law and the authority of the SPD.

32.     SPD Records Custodian John Doe(s) ("Recordkeeping Defendant Doe(s)"), upon information and belief, is/are citizen(s) within this Court's jurisdiction. Recordkeeping Defendant

Doe(s) is/are named in their official capacity and was/were at all pertinent times acting under the color of state law and the authority of the SPD.

## FACTUAL ALLEGATIONS

*Mr. Kennedy's Exercise of Free Speech*

33.     On December 15, 2020, Mr. Kennedy was grieving the recent death of his grandmother who had raised him since birth.  With his grandmother's birthday coming up the next day, Mr. Kennedy needed to clear his mind.  Mr. Kennedy sought fresh air and went to the Family Dollar store to buy groceries for himself and his family.

34.     As he waited in the checkout line, Mr. Kennedy struck up a conversation with another customer.   During that conversation, he expressed his support for the Black Lives Matter movement and discussed his own negative experiences with SPD.

35.     As the conversation continued, Defendant Jackson—a uniformed SPD officer— appeared behind Mr. Kennedy.  Upon information and belief, Defendant Jackson was on-duty at the time.

36.     Mr. Kennedy, continuing his conversation with the other customer, said "I have to watch my back because the police like to put their hands on me."

37.     Defendant Jackson overheard Mr. Kennedy's conversation with the female customer and confronted Mr. Kennedy.

38.     Upon overhearing Mr. Kennedy's comments, Defendant Jackson interrupted the conversating, saying, "excuse me, what did you say?"

39.     Mr. Kennedy said, "I said I have to watch y'all because y'all like to put your hands on me."

40.     In response, Defendant Jackson ordered Mr. Kennedy to "step outside with me."

Defendant Jackson waited behind Mr. Kennedy as he completed his grocery purchase.

***Defendant Police Officers Unlawfully Attack, Arrest, and Search Mr. Kennedy***

41.     Mr. Kennedy completed his purchase and immediately placed his hands behind his back as he left the Family Dollar.  Mr. Kennedy still held the bag of groceries he had just purchased.

42.     Mr. Kennedy's hands remained behind his back throughout his encounter with Defendant Jackson outside the Family Dollar.  Mr. Kennedy was unarmed and did not at any point threaten or resist Defendant Jackson.

43.     As they stood just outside the Family Dollar, beneath one of the store's security cameras aimed at the sidewalk and abutting parking lot, Defendant Jackson asked Mr. Kennedy if he "want[ed] to do something" or "want[ed] an altercation."  To this, Mr. Kennedy replied "no, I'm not stupid."

44.     Defendant Jackson then ordered, "well then, get your motherfucking ass up the street!"

45.     Mr. Kennedy followed the officer's orders and as he walked away said "man, you can't talk to me like that, I pose no threat to you."

46.     Even though Mr. Kennedy had not made any threatening moves nor otherwise acted aggressively, Defendant Jackson re-approached Mr. Kennedy, and grabbed him by the neck.

47.     Defendant Jackson then forcefully slammed Mr. Kennedy's face and body onto the concrete pavement.

48.     Defendant Jackson's assault on Mr. Kennedy was recorded by the Family Dollar's video surveillance.  The following are stills from that surveillance video reflecting Defendant Jackson's initial assault on Mr. Kennedy.

49.     Here, Defendant Jackson (circled in yellow) can be seen walking towards Mr.

Kennedy (wearing a red sweater).  Mr. Kennedy can be seen with his hands behind his back,

holding the groceries in a white bag:



50.     Next, we see Defendant Jackson (indicated with a yellow arrow) come up to

Mr. Kennedy:



51.     Defendant   Jackson   (indicated   again   with   a   yellow   arrow)   then   grabbed

Mr. Kennedy, bending his knees in preparation to throw Mr. Kennedy to the ground:



52.     Defendant Jackson (indicated with a yellow arrow) tackles Mr. Kennedy to the ground:



53.     Defendant Jackson stands over Mr. Kennedy, who is now laying on the ground:



54.     As Mr. Kennedy lay face-down on the ground, Defendant Jackson forced his knee into Mr. Kennedy's neck and back.  Continuing his assault, Defendant Jackson then grabbed Mr. Kennedy's face with both hands and forcibly slammed his face onto the concrete pavement.

55.     As he did so, another officer, Defendant White, approached from a nearby police cruiser.  Condoning Defendant Kennedy's callous disregard for the constitutional rights of those the SPD is sworn to serve and protect, Defendant White did nothing to stop the attack.

56.     The Officer Defendants handcuffed Mr. Kennedy as he lay on the ground.

57.     Surveillance footage that captured the encounter shows Mr. Kennedy posed no threat to the Officer Defendants, others, or himself.

***Defendant Officers Transport Mr. Kennedy to the "Psych Ward"***

58.     Once Mr. Kennedy was in handcuffs, Defendant White told him that he could "get [his groceries] back after [he] go[es] to the hospital."  The Officer Defendants stated further that Mr. Kennedy was "going to the psych ward at the hospital."

59.     Mr. Kennedy complained about his treatment, and the pain he was in, but remained

passive and did not fight or resist in any way.

60.     When Mr. Kennedy asked why he was being arrested, Defendant Jackson stated that he was not arresting Mr. Kennedy or accusing him of any crime.  Instead, Defendant Jackson said he was going to take Mr. Kennedy to the hospital for a mental evaluation.

61.     Mr. Kennedy was placed into Defendant Jackson's patrol car and driven to the Hospital. On the ride over, Mr. Kennedy complained to Defendant Jackson about his unfair, violent treatment.  Defendant Officers admitted that Mr. Kennedy had not committed a crime, but that they were taking him to the "psych ward" because, in their words, "you said you like to fight the police."

62.     At the Hospital, Defendant Jackson escorted Mr. Kennedy in handcuffs through the front desk of the hospital up to the hospital's psychiatric ward, where Defendant Jackson and Mr. Kennedy waited for Mr. Kennedy to be seen by a psychiatrist.  After about twenty minutes, Mr. Kennedy was seen by a doctor who informed Defendant Jackson and Mr. Kennedy that Mr. Kennedy would have to remain overnight in the psychiatric ward until he could be seen by the hospital's head psychiatrist the following morning.

63.     Because Mr. Kennedy was brought to the hospital involuntarily by a police officer, Mr. Kennedy was told he could not leave the psychiatric ward until he was evaluated by a psychiatrist.  After learning that Mr. Kennedy would stay overnight, Defendant Jackson left him in the hospital.

64.     To be clear, Mr. Kennedy only stayed at the hospital overnight because he was brought there in police custody and the psychiatrist would not arrive until the following morning.

65.     The following morning, December 16, 2020, at approximately 7 a.m., the hospital's psychiatrist evaluated Mr. Kennedy, who determined that there was no basis to hold Mr. Kennedy.

66.     After his evaluation, Mr. Kennedy remained at the hospital until approximately 10 a.m., when his father arrived to pick him up.

67.     Mr. Kennedy was never charged with any crime related to this incident.

***Mr. Kennedy Suffers Lasting Physical and Emotional Pain as a Direct Result of His Encounter with Officer Defendants***

68.     In the days following the assault, Mr. Kennedy continued to experience extreme pain and additional swelling to his face, which had been injured when he was slammed to the ground.   Accordingly, on December 17, 2020, Mr. Kennedy took himself to the Hospital's emergency room ("ER").

69.     At the ER, Mr. Kennedy was diagnosed with neck and muscle strain and rib pain on his left side.   The ER administered Mr. Kennedy a non-steroidal anti-inflammatory drug, Ketorolac, to treat his swelling.   Mr. Kennedy was further prescribed Cyclobenzaprine (a muscle relaxant) and Ibuprofen (pain reliever and anti-inflammatory drug) to treat his pain and swelling.

70.     As a direct and proximate result of Defendant Officers' conduct as set forth above, Mr. Kennedy was substantially injured.   These injuries include, but are not limited to, loss of federal and state constitutional rights, physical injuries, great pain and emotional distress, and aggravation of pre-existing conditions.

71.     Mr. Kennedy also continues to suffer ongoing mental and emotional distress with PTSD-type symptoms, including sleeplessness, anxiety, paranoia, sadness, anger, depression, and frustration stemming from mistreatment by law enforcement.

72.     Mr. Kennedy now takes medication for pain resulting from his injuries and also to address his sleeplessness and other emotional distress.

***The Violence Against Mr. Kennedy Is a Direct Result of Defendant Smith's Policy Decisions***

73.     The policy of decertification is an important disciplinary process whereby the

certificate or license of a police officer who commits certain offenses is revoked.

74.     The Council on Peace Officer Standards and Training ("POST Council") is a group of individuals, consisting of the attorney general and 11 members of the Louisiana Commission on Law Enforcement and Administration of Criminal Justice ("LCLE"), which conducts hearings regarding the revocation of the certification of any qualified police officer.[15]

75.     An officer is eligible for revocation where the officer (1) was involuntarily terminated for disciplinary reasons involving civil rights violations, (2) was convicted of a misdemeanor involving domestic battery, or a felony, (3) failed to complete additional training required by the POST Council, (4) had voluntarily surrendered his certification, or (5) had a judicial disposition in a criminal case that results in revocation.[16]

76.     Importantly, the SPD is obligated to "immediately report the conviction of any POST certified" officer to the POST Counsel.[17]   Once the SPD reports the conviction or termination of an officer to the POST Counsel, the POST Counsel may consider decertifying the officer.  Therefore, to the extent Defendant Smith refuses to terminate officers for violating the civil rights of citizens, those officers cannot face decertification.

77.     As chief of police, Defendant Smith is the policymaker responsible for maintaining and enforcing the SPD's policies, including with regard to seeking or supporting the POST Council's decertification of SPD officers who engage in misconduct.

78.     In his official capacity, Defendant Smith has failed to maintain or enforce a policy of decertification.

79.     As a result, the SPD does not terminate police officers who commit certain offenses,

---

[15] La. R.S. 40:2403(A)-(B).

[16] La. R.S. 40:2403(I).

[17] 22 La. Admin. Code Pt III, 4731.

including, but not limited to, retaliating against individuals lawfully exercising their First Amendment right to free speech by illegally detaining or falsely arresting them, and engaging in the use of excessive force.

80.     The impunity resulting from Defendant Smith's failure to maintain or enforce a policy of decertification as to other officers emboldened Officers Jackson and White in this case to engage in unconstitutional conduct without fear of having their employment terminated or being decertified.  Had it not been Defendant Smith's policy to tolerate SPD officers who engage in severe misconduct or to fail to report those officers for decertification, the Officer Defendants would not have so brazenly attacked, searched, and detained Mr. Kennedy in retaliation for his constitutionally protected speech.   Therefore, Defendant Smith's failure to maintain a decertification policy was the moving force behind his injuries on December 15, 2020.

81.     That Mr. Kennedy's assault and illegal arrest by the SPD were not merely isolated incidents perpetrated by rogue officers—but rather the results of Defendant Smith's purposeful policy decisions—is shown by publicly available SPD policing statistics.   The SPD is 19 times more likely to kill a Black person like Mr. Kennedy than a White person.  Moreover, Black people make up 81% of the people arrested by the SPD and 62% of the people killed by the SPD, despite being only 56% of the population.  These are the highly predictable results of Defendant Smith's decision not to discipline or terminate officers who act violently against unarmed Black civilians. When offending officers are not terminated and/or decertified, they are left unchecked to perpetuate violence against vulnerable populations at a highly disproportionate rate.  Sadly, Mr. Kennedy's encounter with the SPD on December 15, 2020, is just one instance of this well-documented violence.

*Recordkeeping Defendants Evade Mr. Kennedy's Requests for Information*

82.     Mr. Kennedy's legal counsel has submitted a series of public information requests to the SPD seeking information and documents regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant White on December 15, 2020.

83.     In response, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, unlawfully resisting the SPD's statutory obligation to respond to the public information requests, and when they did choose to respond, did so with incomplete or inadequate information.

84.     Mr. Kennedy's counsel submitted four formal and written public records requests to SPD: on March 25, 2021, April 12, 2021, June 29, 2021, and October 27, 2021 (collectively "Requests") seeking information related to the December 15, 2020 incident, including video of the incident, body-camera footage, audio, radio calls, notes, and written reports.  *See* Requests attached as Exhibits A, B, C, and D, respectively.

85.     Mr. Kennedy also requested additional documentary evidence related to his claims, including SPD records related to any investigation of the December 15 incident, records related to disciplinary proceedings involving Defendant Jackson and Defendant White, and records related to complaints against other SPD officers for excessive force and any corrective actions taken by the SPD in response to such complaints.

86.     These documents are critical to Mr. Kennedy's claims, particularly his claims against Defendants Jackson, White, and Smith, as they will provide evidence of the SPD's failure to properly discipline officers who engage in misconduct.

87.     Defendant Dunn is the records custodian for the SPD.  In that capacity, he is responsible for responding to written records-requests.

88.     The Recordkeeping Defendants did not respond to the March 25 Request.  Rather, the Shreveport Fire Department did.  *See*, March 30, 2021 Response from the Shreveport Fire Department, attached as Exhibit E.

89.     Unsurprisingly, as the Shreveport Fire Department has no relevance whatsoever to the submitted Requests or the December 15, 2020 incident, the Shreveport Fire Department indicated that they had no responsive documents.

90.     Given this absurd and obviously inadequate response, Mr. Kennedy's counsel sent a second Request to the SPD on April 12, 2021.

91.     On April 26, 2021 – 32 days after the original Request was sent – the Recordkeeping Defendants provided (a) an Offense Report relating to the December 15 incident; (b) a Background Event Chronology relating to the December 15 incident; and (c) two CD-ROMs with limited body camera footage and audio from Defendant Jackson reflecting a portion of the December 15 incident.

92.     This response was both inadequate and incomplete.  In both the March 25 and April 12 Requests, Mr. Kennedy's counsel sought "an opportunity to inspect or obtain copies of public records including, but not limited to, body camera footage, audio, radio calls, notes, and written documents, relating to any complaints Mr. Kennedy submitted regarding the December 15, 2020 incident, as well as any efforts by the department to investigate the same."  Both requests further stated that it was "our understanding that the Internal Affairs Department has obtained a video recording of [the December 15 Incident]."

93.     The Recordkeeping Defendants' April 26 response did not include any information regarding complaints made by Mr. Kennedy, or any video obtained by the Internal Affairs Department.

94.     Given the incomplete response, Mr. Kennedy's counsel contacted various individuals within the SPD informally several times by phone and through email for further information.   After weeks of being directed by phone to various departments within SPD – including (incredibly) the homicide unit – on May 26, 2021, counsel was directed to speak with Defendant Dunn in the Research and Planning Office, who assured counsel that he would appropriately respond to the Requests.

95.     On June 2, 2021, Defendant Dunn informed counsel that SPD did, in fact, have additional video footage and other records relating to the December 15 incident that had not yet been provided in response to the Requests.   Defendant Dunn indicated that he had forwarded this additional information to the City Attorney for review and assured counsel that the requested material would be provided no later than the following Monday, June 7, 2021.

96.     June 7, 2021 came and went with no further response from the Recordkeeping Defendants.

97.     On June 9, June 11, and June 21, 2021, counsel left voicemails for Defendant Dunn inquiring about the additional records.

98.     Counsel spoke with Defendant Dunn again on June 21, 2021.   During this call, Defendant Dunn contacted attorney Joseph Woodley, who indicated that he sent an email communication to counsel on June 3, 2021.   Counsel, however, never received said email. Mr. Woodley indicated that he would waive the processing fees associated with this request due to the extreme delay and further stated that he would send the material to counsel that same day, June 21, 2021.   He did not.

99.     Mr. Kennedy's counsel did not receive any further information until June 25, 2021. That day, counsel received a corrupted video file and another copy of the same Offense Report

that had already been sent on April 26, 2021.  No further information was included.

100.    On June 29, 2021, counsel submitted a third public records request and emailed a courtesy copy of the same request to both Defendant Dunn and Attorney Woodley.  Counsel received no response.

101.    On July 12, 2021, counsel again began contacting Defendant Dunn and Joseph Woodley by phone and email seeking a viewable copy of the video file.  After multiple email exchanges and phone calls, Defendant Dunn finally responded on July 19, 2021.  Following this phone call, Defendant Dunn emailed a viewable copy of the video file.

102.    To be clear, this video had originally been requested on March 25, 2021.  It was not produced until July 19, 2021, and only after arduous follow-up by counsel.

103.    The video file provided on July 19, 2021 appears to be security footage from a local business and reflects a portion of the interaction between Defendant Jackson and Mr. Kennedy on December 15, 2020.

104.    However, in a now familiar pattern, the video file is incomplete.  It is 48 seconds long and reflects only a portion of the incident.  Moreover, the video sent to counsel is not an original file.  It is, bizarrely, an unidentified person's cell phone recording of a computer screen playing a portion of the relevant video.

105.    In a continued effort to obtain a complete and original copy of this critical video evidence, counsel submitted a fourth public records request on October 27, 2021.  This Request reiterated counsel's request for an "opportunity to inspect or obtain copies of public records including, but not limited to, body camera footage, audio, radio calls, notes, and written documents, relating to any complaints Mr. Kennedy submitted regarding the December 15, 2020 incident, as well as any efforts by the department to investigate the same."  The October 27, 2021

Request specifically emphasized that counsel was seeking a full and complete copy of any video or audio footage of the December 15th incident – including, but not limited to, all surveillance footage in SPD's possession reflecting the December 15th incident.

106.   Counsel's October 27, 2021 Request also sought additional documentary evidence relevant to Mr. Kennedy's claims.  Specifically, the October 27, 2021 Request sought:

1. Records that can identify every officer involved in the December 15 Incident, including, but not limited to, an officer named Montrell D. Jackson with a badge number of 1535.

2. Any internal reports relating to the December 15 Incident, including, but not limited to, any reports written by the officers involved in the December 15 Incident.

3. All body, backseat, and dash-camera footage relating to the December 15 Incident.

4. All internal reports relating to the usage of body, backseat, and dash-camera footage by officers.

5. Any records relating to any investigation of the December 15 Incident, including the results of the investigation and the identity of the officer(s) who conducted the investigation.

6. Any records that are open, open but suspended, suspended, or in any other status regarding any prior disciplinary proceedings instituted and/or complaints filed against the officers involved in the December 15 Incident.

7. Any performance reviews, including emails regarding job performance and probationary evaluations for the officers involved in the December 15 Incident.

8. Any records regarding any prior investigations of the officers involved in the December 15 Incident, even if the investigation was unrelated to the December 15 Incident.

9. Any records regarding any trainings that the officers involved in the December 15 Incident have ever been required to attend relating to arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

10. Any records regarding any mandatory training programs for officers of the Shreveport Police Department relating to arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

11. Any records regarding the number of complaints made against the SPD for

excessive force and/or police brutality in the last two years.

12. Any records regarding the number of arrests made by the SPD in the last two years.

13. Any records regarding the number of arrests and/or citations issued by the SPD in the last two years for resisting an officer with force or violence.

14. Any records regarding the SPD's policies and/or procedures for investigating claims of excessive force and/or police brutality.

15. Any records regarding the SPD's policies and/or procedures for an officer's use of force against arrestees.

16. Any records regarding the SPD's internal investigations and findings regarding reports of officers' use of excessive force.

17. Any records regarding public records requests received by the SPD in the last two years relating to claims of excessive force and/or police brutality.

18. Any records regarding public records requests received by the SPD in the last two years relating to an officer's use of force against arrestees.

19. Any records regarding the SPD's responses to the public records requests described in Nos. 17 and 18 above, including but not limited to, the date and content of the SPD's response to the public records requests described in Nos. 17 and 18 above.

107.    On November 11, 2021, Mr. Kennedy's counsel once again followed up by email providing the October 27, 2021 Requests to both Defendant Dunn and Attorney Woodley.  On November 13, 2021, Mr. Woodley responded to counsel via email that he "received [counsel's] email of November 11, 2021 regarding a Public Records Request dated October 27, 2021."  Mr. Woodley responded further that he had been "advised by SPD the request is being processed" and that "[a]s soon as [he] know[s] when a response will be prepared," that he would "let [counsel] know."

108.    To date, Mr. Kennedy's counsel has not received any further response to their fourth public records request.

109.   This is not an isolated incident.  In Mr. Kennedy's case alone, the Recordkeeping Defendants have failed to adequately respond to four separate public records requests.

110.   Others have faced similar stonewalling from the Recordkeeping Defendants in response to similar requests.[18]

111.   Upon information and belief, the Recordkeeping Defendants have repeatedly, over a period of years, failed to adequately respond to public records requests.  This pattern spans requests from multiple unrelated parties, seeking information regarding various incidents of police misconduct.[19]

112.   As reported in the Shreveport Times: "This [failure to respond to a public records request pertaining to police misconduct] is one example of many. Both the City Attorney's Office and Woodley have denied or delayed multiple public records requests, indicating that the requests are 'overly broad and burdensome,' do not exist in a digital format, would 'consume' an extensive amount of time to redact, that 'numerous' hours are necessary to fulfill the request but that the exact number 'cannot be calculated at this time,' and requesting a deposit of funds prior to looking into the request in order to guarantee payment of fees, including additional financial compensation to staff fulfilling the request."

113.   Based on these similar experiences by multiple unrelated individuals seeking access to public records from the SPD regarding various instances of police misconduct, it is clear that the Recordkeeping Defendants are deliberately indifferent to the public records requests seeking

---

[18]    *See, e.g.,* Regan Bashara:  Becoming conscious, Shreveport Times (https://www.shreveporttimes.com/story/opinion/columnists/2021/06/11/regan-bashara-becoming-conscious/7606801002/, last accessed November 12, 2021).

[19]    *Id*. (explaining that the SPD's delayed or inadequate responses with regard to Wavey Austin and Tommie McGlothen are some "of many," and that public records requests are routinely "denied or delayed" amounting to "a stonewall of requests…making public records financially inaccessible, constructing false arguments, and improperly citing reasons for denial of public records.").

information likely to, or that has the potential to, make the SPD look bad, or that would reflect criminal, unlawful, or unconstitutional behavior by SPD officers.   Upon information and belief, the Recordkeeping Defendants treat such requests differently than other public records requests. By refusing to ensure that these types of public records requests are adequately and promptly responded to, the Recordkeeping Defendants have created an environment where victims of police brutality are cut off from the very information necessary to support their claims, thereby encouraging and enabling future police misconduct, and hamstringing efforts to bring judicial action against the perpetrators.

114.   Upon information and belief, Mr. Kennedy's public-records requests were slow-rolled because of the nature of the information he is seeking—specifically, information regarding officer misconduct.   The Defendant Dunn and/or the Recordkeeping Defendants treated Mr. Kennedy's requests for information differently than requests for information made by others who are not seeking to expose police misconduct by repeatedly failing to adequately respond to Mr. Kennedy's requests for documents related to his mistreatment at the hands of the Officer Defendants.

**COUNT ONE**
**Retaliation in violation of 42 U.S.C. § 1983, the First Amendment to the U.S. Constitution, and Article I, § 7 of the Louisiana Constitution**
**(Against Defendant Jackson and Defendant White in their individual capacities)**

115.   Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

116.   The First Amendment of the U.S. Constitution protects the rights of citizens to engage in certain constitutionally protected activity.   Individual speech regarding matters of public policy, public safety, and police misconduct, are examples of such protected activity.

117.   The First Amendment prohibits "abridging the freedom of speech," as applied to

the states under the Fourteenth Amendment to the United States Constitution.

118.    Article I, Section Seven of the Louisiana Constitution prohibits the curtailment or restriction of the freedoms of speech and press and guarantees every person the right to "speak, write, and publish his sentiments on every subject." La. Const. art. I, § 7.

119.    On December 15, 2020, Mr. Kennedy had a constitutional right under the First Amendment to speak to others regarding the Black Lives Matter movement, the misconduct of SPD and its police officers, and Mr. Kennedy's own mistreatment by police.  Thus, Mr. Kennedy was engaged in protected First Amendment activity when he spoke about those matters.

120.    On December 15, 2020, Defendant Jackson responded to Mr. Kennedy's protected speech by attacking Mr. Kennedy, detaining him without a legitimate reason, searching his body, and transporting him to the psychiatric ward of the hospital to further silence and punish Mr. Kennedy.  This violence was done in response to, and because of, Mr. Kennedy's protected speech.

121.    Defendant Jackson violated Mr. Kennedy's First Amendment rights.  Defendant White assisted Defendant Jackson in violating Mr. Kennedy's First Amendment rights.  Any reasonable law enforcement officer would have known that this conduct would violate Mr. Kennedy's constitutional rights.

122.    The Officer Defendants had no probable cause for arresting or searching Mr. Kennedy.

123.    As a direct and proximate result of Defendant Jackson's and Defendant White's behavior, Mr. Kennedy suffered actual physical, mental and emotional harm.

124.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

**COUNT TWO**
**Illegal Detention and False Arrest under the Fourth and Fourteenth Amendments to the**

**U.S. Constitution in violation of 42 U.S.C. § 1983**
**(Against Defendant Jackson and Defendant White in their individual capacities)**

125.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

126.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable search and seizure by law enforcement officers.

127.    The Fourteenth Amendment of the U.S. Constitution protects citizens against arbitrary deprivation of life, liberty, or property by the state.

128.    The Fourth and Fourteenth Amendments prohibit arrest without probable cause.

129.    Defendants Jackson and White arrested Mr. Kennedy when they handcuffed him and placed him in their police cruiser.  Mr. Kennedy's arrest was unlawful because Defendants Jackson and White arrested him without probable cause.  The lack of probable cause to arrest Mr. Kennedy would have been evident to any reasonable person based on the facts and circumstances within Officer Defendants' knowledge at the time.  Officer Defendants did not witness Mr. Kennedy break any law, nor did they have any reason to believe that he had broken any law.

130.    By arresting Mr. Kennedy without probable cause, Officer Defendants violated Mr. Kennedy's Fourth and Fourteenth Amendment rights.

131.    Any reasonable officer would have known that arresting Mr. Kennedy under these circumstances would violate his constitutional rights.

132.    As a direct and proximate result of this false arrest, Mr. Kennedy suffered actual physical, mental, and emotional harm.

133.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

**COUNT THREE**

**Improper search and seizure under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983**
**(Against Defendant Jackson and Defendant White in their individual capacities)**

134.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

135.    The Fourth Amendment of the U.S. Constitution protects citizens against unlawful search and seizure by law enforcement officers.

136.    The Fourth Amendment prohibits law enforcement officers seizing a citizen without legal justification.

137.    Officer Defendants' search of Mr. Kennedy's person and belongings was unlawful. Officer Defendants searched Mr. Kennedy without probable cause.  By doing so, Officer Defendants violated Mr. Kennedy's Fourth Amendment rights.

138.    Any reasonable officer would have known that searching Mr. Kennedy under these circumstances would violate his constitutional rights.

139.    As a direct and proximate result of Officer Defendants' unlawful search, Mr. Kennedy suffered actual physical, mental, and emotional harm.

140.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

## COUNT FOUR
**Excessive and unreasonable force under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983 (Against Defendant Jackson and Defendant White in their individual capacities)**

141.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

142.    The Fourth Amendment of the U.S. Constitution guarantees a clearly established right to be free from excessive force at the hands of the police.

143.    Officer Defendants deprived Mr. Kennedy of clearly established rights guaranteed to him under the United States Constitution.

144.    Officer Defendants' use of excessive force against Mr. Kennedy was the direct and proximate cause of Mr. Kennedy's injuries.

145.    This use of force was not reasonable, proportional, or appropriate, given that Mr. Kennedy was unarmed, not resisting arrest, had his hands placed behind his back, had never made any threatening gestures toward Officer Defendants, and did not pose any threat to the safety of Officer Defendants or any other person.

146.    Any reasonable officer in these circumstances would have recognized that the excessive and violent force applied to Mr. Kennedy while he was compliant and otherwise subdued was utterly unjustified, unnecessary, excessive, and unreasonable.

147.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

## COUNT FIVE
### Intentional, or Alternatively Negligent, Infliction of Emotional Distress
### (Against Defendant Jackson and Defendant White in their individual capacities)

148.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

149.    In *White v. Monsanto Co.,* 585 So. 2d 1205 (La. 1991), the tort of intentional infliction of emotional distress was adopted as a viable cause of action.

150.    One who by extreme and outrageous conduct intentionally causes severe emotional distress to another, is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Id.*

151.    The conduct must be so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.*

152.    In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Id.*

153.    Officer Defendants' use of excessive force against Mr. Kennedy was the direct and proximate cause of Mr. Kennedy's injuries, which included and continue to include severe emotional distress.

154.    Mr. Kennedy was unarmed, not resisting arrest, had his hands placed behind his back, had never made any threatening gestures toward Officer Defendants, and did not pose any threat to the safety of Officer Defendants or any other person.

155.    Given these circumstances, Officer Defendants' use of force on Mr. Kennedy was extreme and outrageous.

156.    Upon information and belief, and based upon the disproportionate violent actions of Officer Defendants here in response to constitutionally protected speech, it is alleged that Officer Defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct

157.    Any reasonable officer in these circumstances would have recognized that the excessive and violent force applied to Mr. Kennedy while he was compliant and otherwise subdued was utterly unjustified, unnecessary, excessive, and unreasonable. Alternatively, the manner in which Defendants behaved was negligent.

158.    Mr. Kennedy is entitled to attorneys' fees and costs, prejudgment interest and any other relief allowable by federal law.

### COUNT SIX
**_Monell_ Claim under the First and Fourth Amendments to the U.S. Constitution in violation of 42 U.S.C. § 1983 (SPD Records Custodian Sgt. Michael Dunn, and SPD Records Custodian John Doe(s), in their individual and official capacities)**

159.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

160.    Mr. Kennedy brings this claim against the Recordkeeping Defendants for their express or implied policy of treating public records requests seeking information regarding police misconduct differently from other requests in violation of the First and Fourteenth Amendments. The First Amendment of the U.S. Constitution protects the rights of citizens to gather news from any source by means within the law.  The First Amendment also prohibits the government from limiting the stock of information from which members of the public may draw.  The Fourteenth Amendment of the U.S. Constitution prohibits disparate treatment of citizens under the law.

161.    The Recordkeeping Defendants are responsible for the SPD's responses to valid public records requests regarding police misconduct.

162.    Mr. Kennedy's legal counsel has submitted four formal public records requests seeking information in the SPD's possession regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant White on December 15, 2020.

163.    In response and without justification, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, repeatedly and unlawfully resisted its statutory obligation to respond to the public information requests, and repeatedly responded with incomplete or inadequate information.  For example, the Recordkeeping Defendants provided incomplete body-camera footage and audio from Defendant Jackson reflecting only a portion of

the December 15 incident, and failed to provide information regarding the SPD's decertification policies.

164.    Due to the deliberate dilatory tactics of the Recordkeeping Defendants, Mr. Kennedy has been unable to collect vital information about not only the facts and circumstances of his own attack by the Officer Defendants, but other information related to the general policies and practices of the SPD.  This includes any records regarding the SPD's discipline or termination of officers due to previous offenses, or the SPD's facilitation of the decertification of any such officers.

165.    Upon information and belief, the Recordkeeping Defendants treated Mr. Kennedy's requests for public records differently because Mr. Kennedy sought the disclosure of public records concerning police misconduct that violated Mr. Kennedy's constitutional rights under the First, Fourth, and Fourteenth Amendments.  Had Mr. Kennedy requested information that did not relate to his attack and illegal arrest by the SPD, the Recordkeeping Defendants would not have repeatedly withheld or delayed the provision of the information Mr. Kennedy sought.

166.    The Recordkeeping Defendants violated Mr. Jackson's First Amendment rights because they took efforts to prevent Mr. Kennedy from exercising his right to gather information about his mistreatment at the hands of SPD officers "from any source by means within the law," and tried to limit Mr. Kennedy's access to the "stock of information" about police misconduct and the SPD's response to such misconduct.  Mr. Kennedy had a right to access these public records pursuant to the Louisiana Public Records Act, as well as under the First Amendment of the U.S. Constitution.  But Sergeant Dunn and the other Recordkeeping Defendants obfuscated and refused to comply with Mr. Kennedy's lawful requests for information, precisely because they knew that the information would help Mr. Kennedy exercise his First Amendment right to speak out against

police misconduct and petition the government (*i.e.*, to petition this Court by filing this lawsuit) for redress of police misconduct.

167.   Sergeant Dunn and the other Recordkeeping Defendants also violated Mr. Kennedy's Fourteenth Amendment rights because they treated Mr. Kennedy differently than they treated other individuals who made requests for information that were not critical of the police because of the viewpoint Mr. Kennedy was expressing through his questions and requests for information.  In other words, the Recordkeeping Defendants discriminated against Mr. Kennedy based on his viewpoint, in violation of the "equal protection" clause under the Fourteenth Amendment.

168.   Mr. Kennedy's experience is not unique, however.  Various others have faced similar tactics when they have made public records requests for information related to their mistreatment by the SPD.[20]

169.   The Recordkeeping Defendants' deliberate indifference to the public records requests submitted to the SPD creates an environment where victims of police brutality are cut off from the very information necessary to support their claims, thereby encouraging and enabling future misconduct.

170.   As the direct and proximate result of Recordkeeping Defendants' deliberate indifference related to responding to public records requests, Mr. Kennedy's rights under the First and Fourteenth Amendments have been violated, and he has suffered actual physical and emotional injuries, and other damages and losses as described herein.

---

[20]   *See, e.g.,* Regan Bashara:  Becoming conscious, *supra* fn. 15. (reporting delayed or inadequate responses to public records requests pertaining to the deaths of Wavey Austin and Tommie McGlothen in or shortly following SPD custody, explaining that these delayed or inadequate responses are some "of many," and that public records requests are routinely "denied or delayed" amounting to "a stonewall of requests…making public records financially inaccessible, constructing false arguments, and improperly citing reasons for denial of public records.").

171.    Mr. Kennedy is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

**COUNT SEVEN**

***Monell* Claim under the First, Fourth, and Fourteenth Amendments of the U.S Constitution in violation of 42 U.S.C. § 1983 (SPD Chief Wayne Smith, in his individual and official capacity)**

172.    Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

173.    Mr. Kennedy brings this claim against Defendant Smith for his failure to discipline or terminate SPD police officer who commits certain offenses, or to support the decertification of such officers.

174.    The SPD Chief of Police is responsible for maintaining disciplinary policies for officers who have committed certain offenses, and for facilitating the decertification of such officers.

175.    Upon information and belief, Defendant Smith does not discipline or terminate police officers who commit certain offenses, including, but not limited to, retaliating against individuals lawfully exercising their First Amendment right to free speech, illegally detaining or falsely arresting individuals, and/or engaging in the use of excessive force.   Further, the Defendant Smith does not support the revocation of the certificates or licenses of such police officers.

176.    The lack of appropriate repercussions for police misconduct, like decertification, enables – and in fact encourages – such behavior to continue.   Defendant Smith has created a custom of condoning a culture within the SPD in which SPD officers have the reasonable belief that their actions will not be properly monitored and that their misconduct will not be thoroughly investigated or sanctioned, but instead will be tolerated and approved.

177.    Defendant Smith's decision to not discipline or terminate SPD officers who engage in misconduct against Black civilians, and his policy of not supporting such officers' decertification, is evidenced by SPD policing statistics.  The SPD has an overall Police Scorecard rating of only 47%, based on poor scores for police accountability, police violence (including police killing of civilians), and arrests for low-level non-violent offenses.[21]  The SPD ranked worse than nearly 70% of its peers when it comes to using deadly force against unarmed civilians. Between 2013 and 2020, the SPD was 19 times more likely to kill a Black civilian than a White on.[22]  Further, despite being 56% of the population, Black people made up 81% of the people arrested by SPD and 62% of the people killed by SPD.[23]  These statistics are the predictable effects of Defendant Smith's policies.

178.    As the direct and proximate result of Defendant Smith's policies and deliberate indifference related to the consequences of the SPD's refusal to discipline or terminate police officers who commit serious offenses, Mr. Kennedy suffered actual physical and emotional injuries, and other damages and losses as described herein.

179.    Mr. Kennedy seeks a declaration affirming that Defendant Smith will enact and enforce a policy supporting decertification whereby the SPD disciplines or terminates a police officer who commits certain offenses, including but not limited to, retaliating against individuals lawfully exercising their First Amendment Right to free speech, illegally detaining or falsely

---

[21]     Police Scorecard, Shreveport Police Department (2020), https://policescorecard.org/la/police-department/shreveport (The Police Scorecard, built by Samuel Sinyangwe and a team of data scientists, designers, developers, organizers, and students, is a nationwide public evaluation of policing in the United States. The Scorecard calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies).

[22]     *Id.*

[23]     *Id.*

arresting individuals, and/or engaging in the use of excessive force.   Mr. Kennedy is additionally entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest and costs allowable by federal law.

### COUNT EIGHT
**Failure to respond to public records request under LA. R.S. § 44:35 (Against SPD Records Custodian Sgt. Michael Dunn, and SPD Records Custodian John Doe(s), in their individual and official capacities)**

180.     Mr. Kennedy repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.   In particular, Mr. Kennedy realleges the same facts alleged in relation to Count Six.

181.     The Public Records Act of Louisiana, La. Rev. Stat. Ann. § 44:31 et seq. allows any person of the age of majority the right to request and inspect any public record.

182.     Section 44:31 dictates that SPD has a responsibility and duty to provide access to public records.

183.     Section 44:32(D) of the Louisiana Public Records Act requires a response to public records requests within three business days.

184.     The SPD is a "public body" as defined by La. Rev. Stat. Ann. § 44:1(A)(1).

185.     No exception to the requirements outlined in La. Rev. Stat. Ann. § 44:31 et seq. exist here.

186.     Mr. Kennedy's legal counsel has submitted four formal public records requests seeking information in the SPD's possession regarding Mr. Kennedy's treatment by Defendant Jackson and Defendant White on December 15, 2020.  These request seek information supporting Counts I-VII in this Amended Complaint.

187.     In response and without any explanation, the Recordkeeping Defendants have led Mr. Kennedy's counsel on a months-long wild goose chase, repeatedly and unlawfully resisting

their statutory obligation to respond to the public information requests, and repeatedly responded with incomplete or inadequate information.

188.   As a direct and proximate result of the Recordkeeping Defendants' inadequate and delayed responses to counsel's repeated public records requests, Mr. Kennedy has been deprived of his statutory right to "inspect, copy, or reproduce" the requested information.  La. Rev. Stat. Ann. § 44:31(B)(1).

189.   By failing to abide by Louisiana law, Sergeant Dunn and other the Recordkeeping Defendants violated Mr. Jackson's First Amendment rights.  Specifically, the Recordkeeping Defendants took efforts to prevent Mr. Kennedy from exercising his right to gather information about his mistreatment at the hands of SPD officers.  Mr. Kennedy had a right to access these public records.  But Sergeant Dunn and the other Recordkeeping Defendants obfuscated and refused to comply with Mr. Kennedy's lawful requests for information, precisely because they knew that the information would help Mr. Kennedy exercise his First Amendment right to speak out against police misconduct and petition the government (*i.e.*, to petition this Court by filing this lawsuit) for redress of police misconduct.

190.   Mr. Kennedy seeks a declaration affirming that the Recordkeeping Defendants will abide by their statutory duties under LA. R.S. § 44:35 and adequately process public records requests submitted regarding police conduct in a timely manner as dictated by LA. R.S. § 44:35.

191.   Mr. Kennedy is entitled to attorneys' fees and costs under La. R.S. 44:35.

### PRAYER FOR RELIEF

Wherefore, in light of the foregoing, Mr. Kennedy respectfully requests that this Court enter judgment against each Defendant, jointly and severally, and award the following relief in the amount to be determined at trial for the violations of Mr. Kennedy's constitutional, statutory, and

common-law rights:

    a)  Compensatory damages;
    b)  Punitive damages;
    c)  Special damages;
    d)  Reasonable attorneys' fees and costs;
    e)  Such other relief as this Court may deem just and proper.

Dated: July 28, 2022

Respectfully submitted,

By: */s/ E. Bridget Wheeler*
Erin Bridget Wheeler (SBN LA 37546)
bwheeler@laaclu.org
Nora S. Ahmed* (SBN NY 5092374)
nahmed@laaclu.org
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
(t) 504 522 0628

Jeremy Blumenfeld (*pro hac vice*)
Jared Killeen (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:   +1.215.963.5000
Facsimile:    +1.215.963.5001
jeremy.blumenfeld@morganlewis.com
jared.killeen@morganlewis.com

*Counsel for Plaintiff*